# EXHIBIT "B-3"

Exhibit 2a(1).

"**Investor-Owned Residential Loans**" means Loans, excluding advances made pursuant to Home Equity Loans, that are secured by mortgages on one- to four family residences or stock of cooperative housing associations that are not owner-occupied. These loans can be treated as Restructured Loans on a commercially reasonable basis and can be a restructured under terms separate from the Exhibit 5 standards. Please refer to Exhibit 2b for guidance in Calculation of Loss for Restructured Loans.

"**Loss**" means a Foreclosure Loss, Restructuring Loss, Short Sale Loss, Portfolio Loss, Modification Default Loss or Deficient Valuation.

"**Loss Amount**" means the dollar amount of loss incurred and reported on the Monthly Certificate for a Single Family Shared-Loss Loan.

"**Modification Default Loss**" means the loss calculated in Exhibits 2a(1) and 2c(1) for single family loans modified under this part of the agreement that default and result in a foreclosure or short sale.

"**Modification Guidelines**" has the meaning provided in Section 2.1(a) of this Single Family Shared-Loss Agreement.

"**Monthly Certificate**" has the meaning provided in Section 2.1(b) of this Single Family Shared-Loss Agreement.

"**Monthly Loss Amount**" means the sum of all Foreclosure Losses, Restructuring Losses, Short Sale Losses, Portfolio Losses, Modification Default Losses and losses in connection with Deficient Valuations realized by the Assuming Bank for any Shared Loss Month.

"**Monthly Shared-Loss Amount**" means the change in the Cumulative Shared-Loss Amount from the beginning of each month to the end of each month.

"**Neutral Member**" has the meaning provided in Section 2. 1(f)(ii) of this Single Family Shared-Loss Agreement.

"**Period Servicing Amount**" means, for any twelve month period with respect to each of the Shared-Loss Agreements during which the loss-sharing provisions of the applicable Shared-Loss Agreement are in effect, the product of (i) the simple average of the principal amount of Shared-Loss Loans and Shared-Loss Assets (other than the Shared-Loss Securities) (in each case as defined in the Shared-Loss Agreements), as the case may be, at the beginning of such period and at the end of such period times (ii) one percent (1%).

"**Portfolio Loss**" means the loss realized on either (i) a portfolio sale of Single Family Shared-Loss Loans in accordance with the terms of Article IV or (ii) the sale of a loan with the consent of the Receiver as provided in Section 2.7.

"**Recovery Amount**" means, with respect to any period prior to the Termination

Case: 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:45    Page 34 of
34

Date, the amount of collected funds received by the Assuming Bank that (i) are applicable against a Foreclosure Loss which has previously been paid to the Assuming Bank by the Receiver or (ii) gains realized from a Section 4.1 sale of Single Family Shared-Loss Loans for which the Assuming Bank has previously received a Restructuring Loss payment from the Receiver (iii) or any incentive payments from national programs paid to an investor or borrower on loans that have been modified or otherwise treated (short sale or foreclosure) in accordance with Exhibit 5.

"**Restructuring Loss**" means the loss on a modified or restructured loan measured by the difference between (a) the principal, Accrued Interest, tax and insurance advances, third party or other fees due on a loan prior to the modification or restructuring, and (b) the net present value of estimated cash flows on the modified or restructured loan, discounted at the Then-Current Interest Rate. Each Restructuring Loss shall be calculated in accordance with the form and methodology attached as Exhibit 2b, as applicable.

"**Restructured Loan**" means a Single Family Shared-Loss Loan for which the Assuming Bank has received a Restructuring Loss payment from the Receiver.  This applies to owner occupied and investor owned residences.

"**Servicing Officer**" has the meaning provided in Section 2.1(b) of this Single Family Shared-Loss Agreement.

"**Shared Loss Payment Trigger**" means when the sum of the Cumulative Loss Amount under this Single Family Shared-Loss Agreement and the Shared-Loss Amount under the Commercial and Other Assets Shared-Loss Agreement, exceeds the First Loss Tranche.  If the First Loss Tranche is zero or a negative number, the Shared Loss Payment Trigger shall be deemed to have been reached upon Bank Closing.

"**Shared-Loss Month**" means each calendar month between the Commencement Date and the last day of the month in which the tenth anniversary of the Commencement Date occurs, provided that, the first Shared-Loss Month shall begin on the Commencement Date and end on the last day of that month.

"**Short-Sale Loss**" means the loss resulting from the Assuming Bank's agreement with the mortgagor to accept a payoff in an amount less than the balance due on the loan (including the costs of any cash incentives to borrower to agree to such sale or to maintain the property pending such sale), further provided, that each Short-Sale Loss shall be calculated in accordance with the form and methodology specified in Exhibit 2c or Exhibit 2c(1).

"**Single Family Shared-Loss Loans**" means the single family one-to-four residential mortgage loans (whether owned by the Assuming Bank or any Subsidiary) identified on Schedule 4.15A of the Purchase and Assumption Agreement.

"**Stated Threshold**" means total losses under the shared loss agreements in the amount of $2,050,000,000.00.

"**Termination Date**" means the last day of the Final Shared-Loss Recovery Month.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 9 .1
November 4, 2009

United Commercial Bank
San Francisco, CA

64

Case 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:45    Page 3 of 34

"**Then-Current Interest Rate**" means the most recently published Freddie Mac survey rate for 30-year fixed-rate loans.

"**Third Party Servicer**" means any servicer appointed from time to time by the Assuming Bank or any Affiliate of the Assuming Bank to service the Shared-Loss Loans on behalf of the Assuming Bank, the identity of which shall be given to the Receiver prior to or concurrent with the appointment thereof.

## ARTICLE II -- SHARED-LOSS ARRANGEMENT

### 2.1    Shared-Loss Arrangement.

(a)    **Loss Mitigation and Consideration of Alternatives**. For each Single Family Shared-Loss Loan in default or for which a default is reasonably foreseeable, the Assuming Bank shall undertake reasonable and customary loss mitigation efforts, in accordance with any of the following programs selected by Assuming Bank in its sole discretion, Exhibit 5 (FDIC Mortgage Loan Modification Program), the United States Treasury's Home Affordable Modification Program Guidelines or any other modification program approved by the United States Treasury Department, the Corporation, the Board of Governors of the Federal Reserve System or any other governmental agency (it being understood that the Assuming Bank can select different programs for the various Single Family Shared-Loss Loans) (such program chosen, the "Modification Guidelines"). After selecting the applicable Modification Guideline for any such Single Family Shared-Loss Loan, the Assuming Bank shall document its consideration of foreclosure, loan restructuring under such Modification Guideline chosen, and short-sale (if short-sale is a viable option) alternatives and shall select the alternative the Assuming Bank believes, based on its estimated calculations, will result in the least Loss.  Losses on Home Equity Loans shall be shared under the charge-off policies of the Assuming Bank's Examination Criteria as if they were Single Family Shared-Loss Loans with respect to the calculation of the Stated Threshold. Assuming Bank shall retain its calculations of the estimated loss under each alternative, such calculations to be provided to the Receiver upon request.  For the avoidance of doubt and notwithstanding anything herein to the contrary, (i) the Assuming Bank is not required to modify or restructure any Single Family Shared-Loss Loan on more than one occasion and (ii) the Assuming Bank is not required to consider any alternatives with respect to any Shared-Loss Loan in the process of foreclosure as of the Bank Closing and shall be entitled to continue such foreclosure measures and recover the Foreclosure Loss as provided herein, and (iii)  the Assuming Bank shall have a transition period of up to 90 days after Bank Closing to implement the Modification Guidelines, during which time, the Assuming Bank may submit claims under such guidelines as may be in place at the Failed Bank.

(b)    **Monthly Certificates**.

Not later than fifteen (15) days after the end of each Shared-Loss Month, beginning with the month in which the Commencement Date occurs and ending in the month in which the tenth anniversary of the Commencement Date occurs, the Assuming Bank shall deliver to the Receiver a certificate, signed by an officer of the Assuming Bank involved in, or responsible for, the administration and servicing of the Single Family Shared-Loss Loans whose name appears on a list of servicing officers furnished by the Assuming Bank to the Receiver, (a

65

"Servicing Officer") setting forth in such form and detail as the Receiver may reasonably specify (a "Monthly Certificate"):

(i)    (A)    a schedule substantially in the form of Exhibit 1 listing:

(i) each Single Family Shared-Loss Loan for which a Loss Amount (calculated in accordance with the applicable Exhibit) is being claimed, the related Loss Amount for each Single Family Shared-Loss Loan, and the total Monthly Loss Amount for all Single Family Shared-Loss Loans;

(ii) each Single Family Shared-Loss Loan for which a Recovery Amount was received, the Recovery Amount for each Single Family Shared-Loss Loan, and the total Recovery Amount for all Single Family Shared-Loss Loans;

(iii) the total Monthly Loss Amount for all Single Family Shared-Loss Loans minus the total monthly Recovery Amount for all Single Family Shared-Loss Loans;

(iv) the Cumulative Shared-Loss Amount as of the beginning and end of the month;

(v) the Monthly Shared Loss Amount;

(vi) the result obtained in (v) times 80%, or times 95% if the Stated Threshold has been reached, which in either case is the amount to be paid under Section 2.1(d) of this Single Family Shared-Loss Agreement by the Receiver to the Assuming Bank if the amount is a positive number, or by the Assuming Bank to the Receiver if the amount is a negative number;

(ii)    (B)    for each of the Single Family Shared-Loss Loans for which a Loss is claimed for that Shared-Loss Month, a schedule showing the calculation of the Loss Amount using the form and methodology shown in Exhibit 2a, Exhibit 2b, or Exhibit 2c, as applicable.

(iii)    (C)    For each of the Restructured Loans where a gain or loss is realized in a sale under Section 4.1 or 4.2, a schedule showing the calculation using the form and methodology shown in Exhibit 2d.

(iv)    (D)    a portfolio performance and summary schedule substantially in the form shown in Exhibit 3.

(c)    **Monthly Data Download**. Not later than fifteen (15) days after the end of each month, beginning with the month in which the Commencement Date occurs and ending with the Final Shared-Loss Recovery Month, Assuming Bank shall provide Receiver:

Case: 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:43    Page 5 of 34

(v) (i) the servicing file in machine-readable format including but not limited to the following fields for each outstanding Single Family Shared-Loss Loan, as applicable:

(A) Loan number
(B) FICO score
(C) Origination date
(D) Original principal amount
(E) Maturity date
(F) Paid-to date
(G) Last payment date
(H) Loan status (bankruptcy, in foreclosure, etc.)
(I) Delinquency counters
(J) Current principal balance
(K) Current escrow account balance
(L) Current Appraisal/BPO value
(M) Current Appraisal/BPO date
(N) Interest rate
(O) Monthly principal and interest payment amount
(P) Monthly escrow payment for taxes and insurance
(Q) Interest rate type (fixed or adjustable)
(R) If adjustable: index, margin, next interest rate reset date
(S) Payment/Interest rate cap and/or floor
(T) Underwriting type (Full doc, Alt Doc, No Doc)
(U) Lien type (1st, 2nd)
(V) Amortization type (amortizing or I/O)
(W) Property address, including city, state, zip code
(X) A code indicating whether the Mortgaged Property is owner occupied
(Y) Property type (single-family detached, condominium, duplex, etc.)

(vi) (ii) An Excel file for ORE held as a result of foreclosure on a Single Family Shared-Loss Loan listing:

(A) Foreclosure date
(B) Unpaid loan principal balance
(C) Appraised value or BPO value, as applicable
(D) Projected liquidation date

Notwithstanding the foregoing, the Assuming Bank shall not be required to provide any of the foregoing information to the extent it is unable to do so as a result of the Failed Bank's or Receiver's failure to provide information required to produce the information set forth in this Section 2.1(c); provided, that the Assuming Bank shall, consistent with Customary Servicing Procedures seek to produce any such missing information or improve any inaccurate information previously provided to it.

(d) **Payments With Respect to Shared-Loss Assets**.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.10
November 4, 2009

United Commercial Bank
San Francisco, CA

Case 09-03228   Doc# 10-4   Filed: 02/09/10   Entered: 02/09/10 18:25:41   Page 6 of 34

67

(i)    **Losses Under the Stated Threshold**. After the Shared Loss Payment Trigger is reached, not later than fifteen (15) days after the date on which the Receiver receives the Monthly Certificate, the Receiver shall pay to the Assuming Bank, in immediately available funds, an amount equal to eighty percent (80%) of the Monthly Shared-Loss Amount reported on the Monthly Certificate. If the total Monthly Shared-Loss Amount reported on the Monthly Certificate is a negative number, the Assuming Bank shall pay to the Receiver in immediately available funds eighty percent (80%) of that amount.

(ii)    **Losses in Excess of the Stated Threshold**. In the event that the sum of the Cumulative Loss Amount under this Single Family Shared-Loss Agreement and the Stated Loss Amount under the Commercial Shared-Loss Agreement meets or exceeds the Stated Threshold, the loss/recovery sharing percentages set forth herein shall change from 80/20 to 95/5 and thereafter the Receiver shall pay to the Assuming Bank, in immediately available funds, an amount equal to ninety-five percent (95%) of the Monthly Shared-Loss Amount reported on the Monthly Certificate. If the Monthly Shared-Loss Amount reported on the Monthly Certificate is a negative number, the Assuming Bank shall pay to the Receiver in immediately available funds ninety-five percent (95%) of that amount.

(e)    **Limitations on Shared-Loss Payment**. The Receiver shall not be required to make any payments pursuant to Section 2.1(d) with respect to any Foreclosure Loss, Restructuring Loss, Short Sale Loss or Portfolio Loss that the Receiver determines, based upon the criteria set forth in this Single Family Shared-Loss Agreement (including the analysis and documentation requirements of Section 2.1(a)) or Customary Servicing Procedures, should not have been effected by the Assuming Bank; provided, however, (x) the Receiver must provide notice to the Assuming Bank detailing the grounds for not making such payment, (y) the Receiver must provide the Assuming Bank with a reasonable opportunity to cure any such deficiency and (z) (1) to the extent curable, if cured, the Receiver shall make payment with respect to the properly effected Loss, and (2) to the extent not curable, notwithstanding the foregoing, the Receiver shall make a payment as to all Losses (or portion of Losses) that were effected which would have been payable as a Loss if the Assuming Bank had properly effected such Loss. In the event that the Receiver does not make any payment with respect to Losses claimed pursuant to Section 2.1(d), the Receiver and Assuming Bank shall, upon final resolution, make the necessary adjustments to the Monthly Shared-Loss Amount for that Monthly Certificate and the payment pursuant to Section 2.1(d) above shall be adjusted accordingly.

(f)    **Payments by Wire-Transfer**. All payments under this Single Family Shared-Loss Agreement shall be made by wire-transfer in accordance with the wire-transfer instructions on Exhibit 4.

(g)    **Payment in the Event Losses Fail to Reach Expected Level**. On the date that is 45 days following the last day (such day, the "True-Up Measurement Date") of the calendar month in which the tenth anniversary of the calendar day following the Bank Closing occurs, the Assuming Bank shall pay to the Receiver fifty percent (50%) of the excess, if any, of (i) twenty percent (20%) of the Stated Threshold less (ii) the sum of (A) twenty-five percent (25%) of the asset premium (discount) plus (B) twenty-five percent (25%) of the Cumulative Shared-Loss Payments plus (C) the Cumulative Servicing Amount. The Assuming Bank shall deliver to the Receiver not later than 30 days following the True-Up Measurement Date, a

schedule, signed by an officer of the Assuming Bank, setting forth in reasonable detail the calculation of the Cumulative Shared-Loss Payments and the Cumulative Servicing Amount.

## 2.2    Auditor Report; Right to Audit.

(a)    Within ninety (90) days after the end of each fiscal year during which the Receiver makes any payment to the Assuming Bank under this Single Family Shared-Loss Agreement, the Assuming Bank shall deliver to the Corporation and to the Receiver a report signed by its independent public accountants stating that they have reviewed the terms of this Single Family Shared-Loss Agreement and that, in the course of their annual audit of the Assuming Bank's books and records, nothing has come to their attention suggesting that any computations required to be made by the Assuming Bank during such year pursuant to this Article II were not made by the Assuming Bank in accordance herewith. In the event that the Assuming Bank cannot comply with the preceding sentence, it shall promptly submit to the Receiver corrected computations together with a report signed by its independent public accountants stating that, after giving effect to such corrected computations, nothing has come to their attention suggesting that any computations required to be made by the Assuming Bank during such year pursuant to this Article II were not made by the Assuming Bank in accordance herewith. In such event, the Assuming Bank and the Receiver shall make all such accounting adjustments and payments as may be necessary to give effect to each correction reflected in such corrected computations, retroactive to the date on which the corresponding incorrect computation was made. It is the intention of this provision to align the timing of the audit required under this Single-Family Shared-Loss Agreement with the examination audit required pursuant to 12 C.F.R. Section 363.

(b)    The Receiver or the FDIC in its corporate capacity ("Corporation") may perform an audit or audits to determine the Assuming Bank's compliance with the provisions of this Single Family Shared-Loss Agreement, including this Article II, by providing not less than ten (10) Business Days' prior written notice. Assuming Bank shall provide access to pertinent records and proximate working space in Assuming Bank's facilities. The scope and duration of any such audit shall be within the reasonable discretion of the Receiver or the Corporation, but shall in no event be administered in a manner that unreasonably interferes with the operation of the Assuming Bank's business. The Receiver or the Corporation, as the case may be, shall bear the expense of any such audit. In the event that any corrections are necessary as a result of such an audit or audits, the Assuming Bank and the Receiver shall make such accounting adjustments and payments as may be necessary to give retroactive effect to such corrections.

## 2.3    Withholdings. 
Notwithstanding any other provision in this Article II, the Receiver, upon the direction of the Director (or designee) of the Federal Deposit Insurance Corporation's Division of Resolutions and Receiverships, may withhold payment for any amounts included in a Monthly Certificate delivered pursuant to Section 2.1, if in its good faith and reasonable judgment there is a reasonable basis under the requirements of this Single Family Shared-Loss Agreement for denying the eligibility of an item for which reimbursement or payment is sought under such Section. In such event, the Receiver shall provide a written notice to the Assuming Bank detailing the grounds for withholding such payment. At such time as the Assuming Bank demonstrates to the satisfaction of the Receiver, in its reasonable judgment, that

the grounds for such withholding of payment, or portion of payment, no longer exist or have been cured, then the Receiver shall pay the Assuming Bank the amount withheld which the Receiver determines is eligible for payment, within fifteen (15) Business Days.

**2.4** **Books and Records**. The Assuming Bank shall at all times during the term of this Single Family Shared-Loss Agreement keep books and records sufficient to ensure and document compliance with the terms of this Single Family Shared-Loss Agreement, including but not limited to (a) documentation of alternatives considered with respect to defaulted loans or loans for which default is reasonably foreseeable, (b) documentation showing the calculation of loss for claims submitted to the Receiver, (c) retention of documents that support each line item on the loss claim forms, and (d) documentation with respect to the Recovery Amount on loans for which the Receiver has made a loss-share payment

**2.5** **Information**. The Assuming Bank shall promptly provide to the Receiver such other information, including but not limited to, financial statements, computations, and bank policies and procedures, relating to the performance of the provisions of this Single Family Shared-Loss Agreement, as the Receiver may reasonably request from time to time.

**2.6** **Tax Ruling**. The Assuming Bank shall not at any time, without the Receiver's prior written consent, seek a private letter ruling or other determination from the Internal Revenue Service or otherwise seek to qualify for any special tax treatment or benefits associated with any payments made by the Receiver pursuant to this Single Family Shared-Loss Agreement.

**2.7** **Sale of Single Family Shared-Loss Loans**. The Receiver shall be relieved of its obligations with respect to a Single Family Shared-Loss Loan upon payment of a Foreclosure Loss amount or a Short Sale Loss amount with respect to such Single Family Shared-Loss Loan or upon the sale of a Single Family Shared-Loss Loan by Assuming Bank to a person or entity that is not an Affiliate; provided, however, that if the Receiver consents to the sale of any such Single Family Shared-Loss Loan, any loss on such sale shall be a Portfolio Loss. The Assuming Bank shall provide the Receiver with timely notice of any such sale. Notwithstanding the foregoing, a sale of the Single Family Shared-Loss Loan, for purposes of this Section 2.7, shall not be deemed to have occurred as the result of (i) any change in the ownership or control of Assuming Bank or the transfer of any or all of the Single Family Shared-Loss Loan(s) to any Affiliate of Assuming Bank, (ii) a merger by Assuming Bank with or into any other entity, or (iii) a sale by Assuming Bank of all or substantially all of its assets.

## ARTICLE III - RULES REGARDING THE ADMINISTRATION OF SINGLE FAMILY SHARED-LOSS LOANS

**3.1** **Agreement with Respect to Administration**. The Assuming Bank shall (and shall cause any of its Affiliates to which the Assuming Bank transfers any Single Family Shared-Loss Loans to) manage, administer, and collect the Single Family Shared-Loss Loans while owned by the Assuming Bank or any Affiliate thereof during the term of this Single Family Shared-Loss Agreement in accordance with the rules set forth in this Article III. The Assuming Bank shall be responsible to the Receiver in the performance of its duties hereunder and shall provide to the Receiver such reports as the Receiver reasonably deems advisable, including but not limited to the reports required by Sections 2.1, 2.2 and 3.3 hereof, and shall permit the

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.1
November 4, 2009

United Commercial Bank
San Francisco, CA

Case 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:45    Page 9 of
70                                    34

Receiver to monitor the Assuming Bank's performance of its duties hereunder.

**3.2**   **Duties of the Assuming Bank**. (a) In performance of its duties under this Article III, the Assuming Bank shall:

(i) manage and administer each Single Family Shared-Loss Loan in accordance with Assuming Bank's usual and prudent business and banking practices and Customary Servicing Procedures;

(ii) exercise its best business judgment in managing, administering and collecting amounts owed on the Single Family Shared-Loss Loans;

(iii) use commercially reasonable efforts to maximize Recoveries with respect to Losses on Single Family Shared-Loss Loans without regard to the effect of maximizing collections on assets held by the Assuming Bank or any of its Affiliates that are not Single Family Shared-Loss Loans;

(iv) retain sufficient staff (in Assuming Bank's discretion) to perform its duties hereunder; and

(v) other than as provided in Section 2.1(a), comply with the terms of the Modification Guidelines for any Single Family Shared-Loss Loans meeting the requirements set forth therein. For the avoidance of doubt, the Assuming Bank may propose exceptions to Exhibit 5 (the FDIC Loan Modification Program) for a group of Loans with similar characteristics, with the objectives of (1) minimizing the loss to the Assuming Bank and the FDIC and (2) maximizing the opportunity for qualified homeowners to remain in their homes with affordable mortgage payments.

(b)      Any transaction with or between any Affiliate of the Assuming Bank with respect to any Single Family Shared-Loss Loan including, without limitation, the execution of any contract pursuant to which any Affiliate of the Assuming Bank will manage, administer or collect any of the Single Family Shared-Loss Loans will be provided to FDIC for informational purposes and if such transaction is not entered into on an arm's length basis on commercially reasonable terms such transaction shall be subject to the prior written approval of the Receiver.

**3.3**   **Shared-Loss Asset Records and Reports**. The Assuming Bank shall establish and maintain such records as may be appropriate to account for the Single Family Shared-Loss Loans in such form and detail as the Receiver may reasonably require, and to enable the Assuming Bank to prepare and deliver to the Receiver such reports as the Receiver may from time to time request regarding the Single Family Shared-Loss Loans and the Monthly Certificates required by Section 2.1 of this Single Family Shared-Loss Agreement.

**3.4**   **Related Loans**.

(a)      Assuming Bank shall use its best efforts to determine which loans are "Related Loans", as hereinafter defined. The Assuming Bank shall not manage, administer or collect any "Related Loan" in any manner that would have the effect of increasing the amount of any collections with respect to the Related Loan to the detriment of the Single Family Shared-Loss Loan to which such loan is related. A "Related Loan" means any loan or extension of credit held by the Assuming Bank at any time on or prior to the end of the Final Shared-Loss Month

that is made to an Obligor of a Single Family Shared-Loss Loan.

(b)     The Assuming Bank shall prepare and deliver to the Receiver with the Monthly Certificates for the calendar months ending June 30 and December 31, a schedule of all Related Loans on the Accounting Records of the Assuming Bank as of the end of each such semi-annual period.

**3.5     Legal Action; Utilization of Special Receivership Powers**. The Assuming Bank shall notify the Receiver in writing (such notice to be given in accordance with Article V below and to include all relevant details) prior to utilizing in any legal action any special legal power or right which the Assuming Bank derives as a result of having acquired an asset from the Receiver, and the Assuming Bank shall not utilize any such power unless the Receiver shall have consented in writing to the proposed usage. The Receiver shall have the right to direct such proposed usage by the Assuming Bank and the Assuming Bank shall comply in all respects with such direction. Upon request of the Receiver, the Assuming Bank will advise the Receiver as to the status of any such legal action. The Assuming Bank shall immediately notify the Receiver of any judgment in litigation involving any of the aforesaid special powers or rights.

**3.6     Third Party Servicer**. The Assuming Bank may perform any of its obligations and/or exercise any of its rights under this Single Family Shared-Loss Agreement through or by one or more Third Party Servicers, who may take actions and make expenditures as if any such Third Party Servicer was the Assuming Bank hereunder (and, for the avoidance of doubt, such expenses incurred by any such Third Party Servicer on behalf of the Assuming Bank shall be included in calculating Losses to the extent such expenses would be included in such calculation if the expenses were incurred by Assuming Bank); provided, however, that the use thereof by the Assuming Bank shall not release the Assuming Bank of any obligation or liability hereunder.

## ARTICLE IV – PORTFOLIO SALE

**4.1     Assuming Bank Portfolio Sales of Remaining Single Family Shared-Loss Loans**. The Assuming Bank shall have the right with the concurrence of the Receiver to liquidate for cash consideration, from time to time in one or more transactions, all or a portion of Single Family Shared-Loss Loans held by the Assuming Bank at any time prior to the Termination Date ("Portfolio Sales"). If the Assuming Bank exercises its option under this Section 4.1, it must give thirty (30) days notice in writing to the Receiver setting forth the details and schedule for the Portfolio Sale which shall be conducted by means of sealed bid sales to third parties, not including any of the Assuming Bank's affiliates, contractors, or any affiliates of the Assuming Bank's contractors. Sales of Restructured Loans shall be sold in a separate pool from Single Family Shared-Loss Loans not restructured. The Receiver's review of the Assuming Bank's proposed Portfolio Sale will be considered in a timely fashion and approval will not be unreasonably withheld, delayed or conditioned.

**4.2     Assuming Bank's Liquidation of Remaining Single Family Shared-Loss Loans**. In the event that the Assuming Bank does not conduct a Portfolio Sale pursuant to Section 4.1, the Receiver shall have the right, exercisable in its sole and absolute discretion, to require the Assuming Bank to liquidate for cash consideration, any Single Family Shared-Loss Loans held by the Assuming Bank at any time after the date that is six months prior to the

Module 1 – Whole Bank w/Loss Share – P&A
Version 1.1
November 4, 2009

United Commercial Bank
San Francisco, CA

Case 09-03228   Doc# 10-4   Filed: 02/09/10   Entered: 02/09/10 18:25:44   Page 11
72 of 34

Termination Date. If the Receiver exercises its option under this Section 4.2, it must give notice in writing to the Assuming Bank, setting forth the time period within which the Assuming Bank shall be required to liquidate the Single Family Shared-Loss Loans. The Assuming Bank will comply with the Receiver's notice and must liquidate the Single Family Shared-Loss Loans as soon as reasonably practicable by means of sealed bid sales to third parties, not including any of the Assuming Bank's affiliates, contractors, or any affiliates of the Assuming Bank's contractors. The selection of any financial advisor or other third party broker or sales agent retained for the liquidation of the remaining Single Family Shared-Loss Loans pursuant to this Section shall be subject to the prior approval of the Receiver, such approval not to be unreasonably withheld, delayed or conditioned.

**4.3**    **Calculation of Sale Gain or Loss**. For Single Family Shared-Loss Loans that are not Restructured Loans gain or loss on the sales under Section 4.1 or Section 4.2 will be calculated as the sale price received by the Assuming Bank less the unpaid principal balance of the remaining Single Family Shared-Loss Loans. For any Restructured Loan included in the sale gain or loss on sale will be calculated as (a) the sale price received by the Assuming Bank less (b) the net present value of estimated cash flows on the Restructured Loan that was used in the calculation of the related Restructuring Loss plus (c) Loan principal payments collected by the Assuming Bank from the date the Loan was restructured to the date of sale. (See Exhibit 2d for example calculation).

## ARTICLE V -- LOSS-SHARING NOTICES GIVEN TO RECEIVER AND PURCHASER

All notices, demands and other communications hereunder shall be in writing and shall be delivered by hand, or overnight courier, receipt requested, addressed to the parties as follows:

| | |
|---|---|
| If to Receiver, to: | Federal Deposit Insurance Corporation as Receiver for United Commercial Bank<br>Division of Resolutions and Receiverships<br>550 17th Street, N.W.<br>Washington, D.C. 20429<br>Attention: Ralph Malami, Manager, Capital Markets |
| with a copy to: | Federal Deposit Insurance Corporation<br>as Receiver for United Commercial Bank<br>Room E7056<br>3501 Fairfax Drive, Arlington, VA 2226<br>Attn: Special Issues Unit |

With respect to a notice under Section 3.5 of this Single Family Shared-Loss Agreement, copies of such notice shall be sent to:

Federal Deposit Insurance Corporation
40 Pacifica
Irvine, CA  92618
Attention: Managing Attorney

If to Assuming Bank, to:
East West Bank
135 N. Los Robles Ave., 7th Floor
Pasadena, CA  91101

Attn:  Douglas P. Krause

with a copy to:

Dominic Ng

Such Persons and addresses may be changed from time to time by notice given pursuant to the provisions of this Article V. Any notice, demand or other communication delivered pursuant to the provisions of this Article V shall be deemed to have been given on the date actually received.


## ARTICLE VI -- MISCELLANEOUS

**6.1.**    **Expenses**.  Except as otherwise expressly provided herein, all costs and expenses incurred by or on behalf of a party hereto in connection with this Single Family Shared-Loss Agreement shall be borne by such party whether or not the transactions contemplated herein shall be consummated.

**6.2**    **Successors and Assigns; Specific Performance.**  All terms and provisions of this Single Family Shared-Loss Agreement shall be binding upon and shall inure to the benefit of the parties hereto only; provided, however, that, Receiver may assign or otherwise transfer this Single Family Shared-Loss Agreement (in whole or in part) to the Federal Deposit Insurance Corporation in its corporate capacity without the consent of Assuming Bank.  Notwithstanding anything to the contrary contained in this Single Family Shared-Loss Agreement, except as is expressly permitted in this Section 6.2, Assuming Bank may not assign or otherwise transfer this Single Family Shared-Loss Agreement (in whole or in part) without the prior written consent of the Receiver, which consent may be granted or withheld by the Receiver in its sole discretion, and any attempted assignment or transfer in violation of this provision shall be void *ab initio.* For the avoidance of doubt, a merger or consolidation of the Assuming Bank with and into another financial institution, the sale of all or substantially all of the assets of the Assuming Bank to another financial institution constitutes the transfer of this Single Family Shared-Loss Agreement which requires the consent of the Receiver; and for a period of  thirty-six (36) months after Bank Closing, a merger or consolidation shall also include the sale by any individual shareholder, or shareholders acting in concert, of more than 9% of the outstanding shares of the Assuming Bank, or of its holding company (except for a holding company with shares that are publicly traded and listed on a stock exchange)., or of any subsidiary holding Shared-Loss Assets, or the sale of shares by the Assuming Bank or its holding company (except for a holding company with shares that are publicly traded and listed on a stock exchange). or any subsidiary holding Shared-Loss Assets, in a public or private offering, that increases the number of shares outstanding by more than 9% and after issuance results in a change of shareholder interest of more than 9%, constitutes the transfer of this Single Family Shared-Loss Agreement which

outstanding principal balance of Shared-Loss Assets is less than twenty percent (20%) of the initial aggregate balance of Shared-Loss Assets.

**6.3**　　**Governing Law**. This Single Family Shared-Loss Agreement shall be construed in accordance with federal law, or, if there is no applicable federal law, the laws of the State of New York, without regard to any rule of conflict of law that would result in the application of the substantive law of any jurisdiction other than the State of New York.

**6.4**　　**WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF OR RELATING TO OR IN CONNECTION WITH THIS SINGLE FAMILY SHARED-LOSS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

**6.5**　　**Captions**. All captions and headings contained in this Single Family Shared-Loss Agreement are for convenience of reference only and do not form a part of, and shall not affect the meaning or interpretation of, this Single Family Shared-Loss Agreement.

**6.6**　　**Entire Agreement; Amendments**. This Single Family Shared-Loss Agreement, along with the Commercial Shared-Loss Agreement and the Purchase and Assumption Agreement, including the Exhibits and any other documents delivered pursuant hereto or thereto, embody the entire agreement of the parties with respect to the subject matter hereof, and supersede all prior representations, warranties, offers, acceptances, agreements and understandings, written or oral, relating to the subject matter herein. This Single Family Shared-Loss Agreement may be amended or modified or any provision thereof waived only by a written instrument signed by both parties or their respective duly authorized agents.

**6.7**　　**Severability**. Whenever possible, each provision of this Single Family Shared-Loss Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Single Family Shared-Loss Agreement is held to be prohibited by or invalid, illegal or unenforceable under applicable law, such provision shall be construed and enforced as if it had been more narrowly drawn so as not to be prohibited, invalid, illegal or unenforceable, and the validity, legality and enforceability of the remainder of such provision and the remaining provisions of this Single Family Shared-Loss Agreement shall not in any way be affected or impaired thereby.

**6.8**　　**No Third Party Beneficiary**. This Single Family Shared-Loss Agreement and the Exhibits hereto are for the sole and exclusive benefit of the parties hereto and their respective permitted successors and permitted assigns and there shall be no other third party beneficiaries, and nothing in this Single Family Shared-Loss Agreement or the Exhibits shall be construed to grant to any other Person any right, remedy or Claim under or in respect of this Single Family Shared-Loss Agreement or any provision hereof.

**6.9**　　**Counterparts**. This Single Family Shared-Loss Agreement may be executed separately by Receiver and Assuming Bank in any number of counterparts, each of which when

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.1
November 4, 2009

United Commercial Bank
San Francisco, CA

Case 09-03228　Doc# 10-4　Filed: 02/09/10　Entered: 02/09/10 18:25:44　Page 14
75
of 34

executed and delivered shall be an original, but such counterparts shall together constitute one and the same instrument.

**6.10** **Consent**. Except as otherwise provided herein, when the consent of a party is required herein, such consent shall not be unreasonably withheld or delayed.

**6.11** **Rights Cumulative**. Except as otherwise expressly provided herein, the rights of each of the parties under this Single Family Shared-Loss Agreement are cumulative, may be exercised as often as any party considers appropriate and are in addition to each such party's rights under the Purchase and Sale Agreement and any of the related agreements or under law. Except as otherwise expressly provided herein, any failure to exercise or any delay in exercising any of such rights, or any partial or defective exercise of such rights, shall not operate as a waiver or variation of that or any other such right.

**ARTICLE VII**
**DISPUTE RESOLUTION**

**7.1** **Dispute Resolution Procedures.**

(a)     In the event a dispute arises about the interpretation, application, calculation of Loss, or calculation of payments or otherwise with respect to this Single Family Shared-Loss Agreement ("SF Shared-Loss Dispute Item"), then the Receiver and the Assuming Bank shall make every attempt in good faith to resolve such items within sixty (60) days following the receipt of a written description of the SF Shared-Loss Dispute Item, with notification of the possibility of taking the matter to arbitration (the date on which such 60-day period expires, or any extension of such period as the parties hereto may mutually agree to in writing, herein called the "Resolution Deadline Date"). If the Receiver and the Assuming Bank resolve all such items to their mutual satisfaction by the Resolution Deadline Date, then within thirty (30) days following such resolution, any payment arising out such resolution shall be made arising from the settlement of the SF Shared-Loss Dispute.

(b)     If the Receiver and the Assuming Bank fail to resolve any outstanding SF Shared-Loss Dispute Items by the Resolution Deadline Date, then either party may notify the other of its intent to submit the SF Shared-Loss Dispute Item to arbitration pursuant to the provisions of this Article VII. Failure of either party to notify the other of its intent to submit any unresolved SF Shared-Loss Dispute Item to arbitration within thirty (30) days following the Resolution Deadline Date (the date on which such thirty (30) day period expires is herein called the "Arbitration Deadline Date") shall be deemed an acceptance of such SF Shared-Loss Dispute not submitted to arbitration, as well as a waiver of the submitting party's right to dispute such non-submitted SF Shared-Loss Dispute Item but not a waiver of any similar claim which may arise in the future.

(c)     If a SF Shared-Loss Dispute Item is submitted to arbitration, it shall be governed by the rules of the American Arbitration Association (the "AAA"), except as otherwise provided herein. Either party may submit a matter for arbitration by delivering a notice, prior to the Arbitration Deadline Date, to the other party in writing setting forth:

Case: 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:44    Page 15 of 34

(i)     A brief description of each SF Shared-Loss Dispute Item submitted for arbitration;

(ii)     A statement of the moving party's position with respect to each SF Shared-Loss Dispute Item submitted for arbitration;

(iii)     The value sought by the moving party, or other relief requested regarding each SF Shared-Loss Dispute Item submitted for arbitration, to the extent reasonably calculable; and

(iv)     The name and address of the arbiter selected by the moving party (the "Moving Arbiter"), who shall be a neutral, as determined by the AAA.

Failure to adequately include any information above shall not be deemed to be a waiver of the parties right to arbitrate so long as after notification of such failure the moving party cures such failure as promptly as reasonably practicable.

(d)     The non-moving party shall, within thirty (30) days following receipt of a notice of arbitration pursuant to this Section 7.1, deliver a notice to the moving party setting forth:

(i)     The name and address of the arbiter selected by the non-moving party (the "Respondent Arbiter"), who shall be a neutral, as determined by the AAA;

(ii)     A statement of the position of the respondent with respect to each Dispute Item; and

(iii)     The ultimate resolution sought by the respondent or other relief, if any, the respondent deems is due the moving party with respect to each SF Shared-Loss Dispute Item.

Failure to adequately include any information above shall not be deemed to be a waiver of the non-moving party's right to defend such arbitration so long as after notification of such failure the non-moving party cures such failure as promptly as reasonably practicable

(e)     The Moving Arbiter and Respondent Arbiter shall select a third arbiter from a list furnished by the AAA. In accordance with the rules of the AAA, the three (3) arbiters shall constitute the arbitration panel for resolution of each SF Loss-Share Dispute Item. The concurrence of any two (2) arbiters shall be deemed to be the decision of the arbiters for all purposes hereunder. The arbitration shall proceed on such time schedule and in accordance with the Rules of Commercial Arbitration of the AAA then in effect, as modified by this Section 7.1. The arbitration proceedings shall take place at such location as the parties thereto may mutually agree, but if they cannot agree, then they will take place at the offices of the Corporation in Washington, DC, or Arlington, Virginia.

(f)     The Receiver and Assuming Bank shall facilitate the resolution of each outstanding SF Shared-Loss Dispute Item by making available in a prompt and timely manner to one another and to the arbiters for examination and copying, as appropriate, all documents, books, and records under their respective control and that would be discoverable under the Federal Rules of Civil Procedure.

(g)     The arbiters designated pursuant to subsections (c), (d) and (e) hereof shall select, with respect to each Dispute Item submitted to arbitration pursuant to this Section 7.1, either (i)

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.1
November 4, 2009

Case 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:44    Page 16

77 of 34

United Commercial Bank
San Francisco, CA

the position and relief submitted by the Assuming Bank with respect to each SF Shared-Loss Dispute Item, or (ii) the position and relief submitted by the Receiver with respect to each SF Shared-Loss Dispute Item, in either case as set forth in its respective notice of arbitration. The arbiters shall have no authority to select a value for each Dispute Item other than the determination set forth in Section 7.1(c) and Section 7.1(d). The arbitration shall be final, binding and conclusive on the parties.

(h)     Any amounts ultimately determined to be payable pursuant to such award shall bear interest at the Settlement Interest Rate from and including the date specified for the arbiters decisions specified in this Section 7.1, without regard to any extension of the finality of such award, to but not including the date paid. All payments required to be made under this Section 7.1 shall be made by wire transfer.

(i)     For the avoidance of doubt, to the extent any notice of a SF Shared-Loss Dispute Item(s) is provided prior to the Termination Date, the terms of this Single Family Shared-Loss Agreement shall remain in effect with respect to the Single Family Shared-Loss Loans that are the subject of such SF Shared-Loss Dispute Item(s) until such time as any such dispute is finally resolved.

**7.2     Fees and Expenses of Arbiters.**  The aggregate fees and expenses of the arbiters shall be borne equally by the parties.  The parties shall pay the aggregate fees and expenses within thirty (30) days after receipt of the written decision of the arbiters (unless the arbiters agree in writing on some other payment schedule).

Exhibit 1

**Monthly Certificate**

**SEE FOLLOWING PAGE**

Module 1 – Whole Bank w/Loss Share – P&A
Version 1.12
November 4, 2009

United Commercial Bank
San Francisco, CA

78

Case 09-03228     Doc# 10-4     Filed: 02/09/10     Entered: 02/09/10 18:25:44     Page 17 of 34



**PART 1 - CURRENT MONTH NET LOSS**

**MONTH ENDED:** [input report month]

Specify loss type as Foreclosure, or Short-Sale.

**Losses**

| Loan No. | Loss Type | Loss Amount | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| TOTAL | | XX | A | |

Loss Amount is the amount of Loss incurred and reported on the loan in a

Loss Month is the reporting month in which the Loss was reported.

**Recoveries**

| Loan No. | Recovery Amount | Loss Amount | Loss Month |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL | XX | B | |

| Net Losses (Recoveries) | XX | C = A - B | |
|---|---|---|---|

If Col. D minus Col. E is less than zero, enter zero.

**PART 2 - FIRST LOSS TEST**

| | Col. D Cumulative Loss Amount | Col. E First Loss Tranche | Col. D - Col. E Cumulative Shared-Loss Amount | |
|---|---|---|---|---|
| Balance, beginning of month | XX | XX | XX | F |
| Current month Net Losses (from Part 1) | XX | | | |
| | | | | |
| Balance, end of month | XX | XX | XX | G |
| | | | | |
| | | | | |
| Shared Loss Amount | | | XX | G - F |
| Times Loss Share percentage | | | 80% | |
| | | | | |
| Amount due from (to) FDIC as Receiver | | | XX | |

79
of 34

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.1
November 4, 2009

United Commercial Bank
San Francisco, CA

Case 09-03228   Doc# 10-4   Filed: 02/09/10   Entered: 02/09/10 18:25:41   Page 18

| Pursuant to Section 2.1 of the Single Family Shared-Loss Agreement, the undersigned hereby certifies the information on this Certificate is true, complete and correct. | |
|---|---|
| **OFFICER SIGNATURE** | |
| **OFFICER NAME:** | **TITLE** |

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

Case: 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:44    Page 19

United Commercial Bank
San Francisco, CA

80 of 34

## Exhibit 2a

This exhibit contains three versions of the loss share calculation for foreclosure, plus explanatory notes.

### Exhibit 2a(1)
#### CALCULATION OF FORECLOSURE LOSS
#### Foreclosure Occurred Prior to Loss Share Agreement

| | | |
|---|---|---:|
| 1 | **Shared-Loss Month** | May-09 |
| 2 | **Loan no:** | 364574 |
| 3 | **REO #** | 621 |
| | | |
| 4 | Foreclosure date | 12/18/08 |
| 5 | Liquidation date | 4/12/09 |
| 6 | Note Interest rate | 8.100% |
| 7 | Most recent BPO | 228,000 |
| 8 | Most recent BPO date | 1/21/09 |
| | | |
| | **Foreclosure Loss calculation** | |
| 9 | Book value at date of Loss Share agreement | 244,900 |
| 10 | Accrued interest, limited to 90 days or days from failure to sale, whichever is less | 3,306 |
| 11 | Costs incurred after Loss Share agreement in place: | |
| 12 | Attorney's fees | 0 |
| 13 | Foreclosure costs, including title search, filing fees, advertising, etc. | 0 |
| 14 | Property protection costs, maint. and repairs | 6,500 |
| 15 | Tax and insurance advances | 0 |
| | Other Advances | |
| 16 | Appraisal/Broker's Price Opinion fees | 0 |
| 17 | Inspections | 0 |
| 18 | Other | 0 |
| | | |
| 19 | Gross balance recoverable by Purchaser | 254,706 |
| | | |
| | **Cash Recoveries:** | |
| 20 | Net liquidation proceeds (from HUD-1 settl stmt) | 219,400 |
| 21 | Hazard Insurance proceeds | 0 |
| 22 | Mortgage Insurance proceeds | 0 |
| 23 | T & I escrow account balances, if positive | 0 |
| 24 | Other credits, if any (itemize) | 0 |
| 25 | Total Cash Recovery | 219,400 |
| | | |
| 26 | **Loss Amount** | 35,306 |

**Exhibit 2a(2)**

**CALCULATION OF FORECLOSURE LOSS**

**No Preceeding Loan Mod under Loss Share**

| | | |
|---|---|---|
| 1 | **Shared-Loss Month** | May-09 |
| 2 | **Loan no:** | 292334 |
| 3 | **REO #** | 477 |
| | | |
| 4 | Interest paid-to-date | 4/30/08 |
| 5 | Foreclosure date | 1/15/09 |
| 6 | Liquidation date | 4/12/09 |
| 7 | Note Interest rate | 8.000% |
| 8 | Owner occupied? | Yes |
| 9 | If owner-occupied: | |
| 10 | Borrower current gross annual income | 42,000 |
| 11 | Estimated NPV of loan mod | 195,000 |
| 12 | Most recent BPO | 235,000 |
| 13 | Most recent BPO date | 1/21/09 |

**Foreclosure Loss calculation**

| | | |
|---|---|---|
| 16 | Loan Principal balance after last paid installment | 300,000 |
| 17 | Accrued interest, limited to 90 days | 6,000 |
| 18 | Attorney's fees | 0 |
| 19 | Foreclosure costs, including title search, filing fees, advertising, etc. | 4,000 |
| 20 | Property protection costs, maint. and repairs | 5,500 |
| 21 | Tax and insurance advances | 1,500 |
| | Other Advances | |
| 22 | Appraisal/Broker's Price Opinion fees | 0 |
| 23 | Inspections | 50 |
| 24 | Other | 0 |
| 25 | Gross balance recoverable by Purchaser | 317,050 |

**Cash Recoveries:**

| | | |
|---|---|---|
| 26 | Net liquidation proceeds (from HUD-1 settl stmt) | 205,000 |
| 27 | Hazard Insurance proceeds | 0 |
| 28 | Mortgage Insurance proceeds | 0 |
| 29 | T & I escrow account balances, if positive | 0 |
| 30 | Other credits, if any (itemize) | 0 |
| 31 | Total Cash Recovery | 205,000 |
| | | |
| 32 | **Loss Amount** | 112,050 |

**Exhibit 2a(3)**

**CALCULATION OF FORECLOSURE LOSS**
**Foreclosure after a Covered Loan Mod**

| | | |
|---|---|---|
| 1 | **Shared-Loss Month** | May-09 |
| 2 | **Loan no:** | 138554 |
| 3 | **REO #** | 843 |
| | | |
| 4 | Loan mod date | 1/17/08 |
| 5 | Interest paid-to-date | 4/30/08 |
| 6 | Foreclosure date | 1/15/09 |
| 7 | Liquidation date | 4/12/09 |
| 8 | Note Interest rate | 4.000% |
| 9 | Most recent BPO | 210,000 |
| 10 | Most recent BPO date | 1/20/09 |

**Foreclosure Loss calculation**

| | | |
|---|---|---|
| 11 | NPV of projected cash flows at loan mod | 285,000 |
| 12 | Less: Principal payments between loan mod and deliquency | 2,500 |
| 13 | Plus: | |
| 14 | Attorney's fees | 0 |
| 15 | Foreclosure costs, including title search, filing fees, advertising, etc. | 4,000 |
| 16 | Property protection costs, maint. and repairs | 7,000 |
| 17 | Tax and insurance advances | 2,000 |
| 18 | Other Advances | |
| 19 | Appraisal/Broker's Price Opinion fees | 0 |
| 20 | Inspections | 0 |
| 21 | Other | 0 |
| | | |
| 22 | Gross balance recoverable by Purchaser | 295,500 |

**Cash Recoveries:**

| | | |
|---|---|---|
| 23 | Net liquidation proceeds (from HUD-1 settl stmt) | 201,000 |
| 24 | Hazard Insurance proceeds | 0 |
| 25 | Mortgage Insurance proceeds | 0 |
| 26 | T & I escrow account balances, if positive | 0 |
| 27 | Other credits, if any (itemize) | 0 |
| 28 | Total Cash Recovery | 201,000 |
| | | |
| 29 | **Loss Amount** | 94,500 |

Case: 09-03228   Doc# 10-4   Filed: 02/09/10   Entered: 02/09/10 18:25:41   Page 22 of 34

**Notes to Exhibit 2a (foreclosure)**

1. The data shown are for illustrative purpose. The figures will vary for actual restructurings.
2. The covered loss is the difference between the gross balance recoverable by Purchaser and the total cash recovery. There are three methods of calculation for covered losses from foreclosures, depending upon the circumstances. They are shown below:
   a. If foreclosure occurred prior to the beginning of the Loss Share agreement, use Exhibit 2a(1). This version uses the book value of the REO as the starting point for the covered loss.
   b. If foreclosure occurred after the Loss Share agreement was in place, and if the loan was not restructured when the Loss Share agreement was in place, use Exhibit 2a(2). This version uses the unpaid balance of the loan as of the last payment as the starting point for the covered loss.
   c. If the loan was restructured when the Loss Share agreement was in place, and then foreclosure occurred, use Exhibit 2a(3). This version uses the Net Present Value (NPV) of the modified loan as the starting point for the covered loss.
3. For Exhibit 2a(1), the gross balance recoverable by the purchaser is calculated as the sum of lines 9 – 18; it is shown in line 19. For Exhibit 2a(2), the gross balance recoverable by the purchaser is calculated as the sum of lines 16 – 24; it is shown in line 25. For Exhibit 2a(3), the gross balance recoverable by the purchaser is calculated as line 11 minus line 12 plus lines 13 – 21; it is shown in line 22.
4. For Exhibit 2a(1), the total cash recovery is calculated as the sum of lines 20 – 24; it is shown in line 25. For Exhibit 2a(2), the total cash recovery is calculated as the sum of lines 26 – 30; it is shown in line 31. For Exhibit 2a(3), the total cash recovery is calculated as the sum of lines 23 – 27; it is shown in line 28.
5. Reasonable and customary third party attorney's fees and expenses incurred by or on behalf of Assuming Bank in connection with any enforcement procedures, or otherwise with respect to such loan, are reported under Attorney's fees.
6. Assuming Bank's (or Third Party Servicer's) reasonable and customary out-of-pocket costs paid to either a third party or an affiliate (if affiliate is pre-approved by the FDIC) for foreclosure, property protection and maintenance costs, repairs, assessments, taxes, insurance and similar items are treated as part of the gross recoverable balance, to the extent they are not paid from funds in the borrower's escrow account. Allowable costs are limited to amounts per Freddie Mac and Fannie Mae guidelines (as in effect from time to time), where applicable, provided that this limitation shall not apply to costs or expenses relating to environmental conditions.
7. Do not include late fees, prepayment penalties, or any similar lender fees or charges by the Failed Bank or Assuming Bank to the loan account, any allocation of Assuming Bank's servicing costs, or any allocations of Assuming Bank's general and administrative (G&A) or other operating costs.
8. If Exhibit 2a(3) is used, then no accrued interest may be included as a covered loss. Otherwise, the amount of accrued interest that may be included as a covered loss is limited to the minimum of:
   a. 90 days
   b. The number of days that the loan is delinquent when the property was sold

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.1
November 4, 2009

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:44    Page 23
84 of 34

c. The number of days between the resolution date and the date when the property was sold

To calculate accrued interest, apply the note interest rate that would have been in effect if the loan were performing to the principal balance after application of the last payment made by the borrower.

Case: 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:44    Page 24 of 34

# Exhibit 2b

This exhibit contains the loss share calculation for restructuring (loan mod), plus explanatory notes.

## Exhibit 2b
### CALCULATION OF RESTRUCTURING LOSS

| | | |
|---|---|---|
| 1 | **Shared-Loss Month** | May-09 |
| 2 | **Loan no:** | 123456 |
| | **Loan before Restructuring** | |
| 3 | Original loan amount | 500,000 |
| 4 | Current unpaid principal balance | 450,000 |
| 5 | Remaining term | 298 |
| 6 | Interest rate | 7.500% |
| 7 | Interest Paid-To-Date | 2/29/08 |
| 8 | Monthly payment - P&I | 3,333 |
| 9 | Monthly payment - T&I | 1,000 |
| 10 | Total monthly payment | 4,333 |
| 11 | Loan type (fixed-rate, ARM, I/O, Option ARM, etc.) | Option ARM |
| 12 | Borrower current annual income | 82,000 |
| | **Terms of Modified/Restructured Loan** | |
| 13 | Closing date on modified/restructured loan | 4/19/09 |
| 14 | New Principal balance | 461,438 |
| 15 | Remaining term | 313 |
| 16 | Interest rate | 3.500% |
| 17 | Monthly payment - P&I | 1,346 |
| 18 | Monthly payment - T&I | 800 |
| 19 | Total monthly payment | 2,146 |
| 20 | Loan type (fixed-rate, ARM, I/O, Option ARM, etc.) | IO Hybrid |
| 21 | Lien type (1st, 2nd) | 1st |
| | If adjustable: | |
| 22 | Initial interest rate | 3.500% |
| 23 | Term - initial interest rate | 60 Months |
| 24 | Initial payment amount | 2,146 |
| 25 | Term-initial payment amount | 60 Months |
| 26 | Negative amortization? | No |
| 27 | Rate reset frequency after first adjustment | 6 Months |
| 28 | Next reset date | 5/1/14 |
| 29 | Index | LIBOR |
| 30 | Margin | 2.750% |
| 31 | Cap per adjustment | 2.000% |
| 32 | Lifetime Cap | 9.500% |
| 33 | Floor | 2.750% |
| 34 | Front end DTI | 31% |
| 35 | Back end DTI | 45% |
| | **Restructuring Loss Calculation** | |
| 36 | Loan Principal balance before restructuring | 450,000 |
| 37 | Accrued interest, limited to 90 days | 8,438 |
| 38 | Tax and insurance advances | 3,000 |
| 39 | 3rd party fees due | - |
| 40 | Total loan balance due before restructuring | 461,438 |
| | **Assumptions for NPV Calculation, Restructured Loan:** | |
| 41 | Discount rate for projected cash flows | 5.530% |
| 42 | Loan prepayment in full | 120 Months |
| 43 | NPV of projected cash flows | 403,000 |
| 44 | **Loss Amount** | 58,438 |

Module I – Whole Bank w/ Loss Share – P&A
Version 1.09
November 4, 2009

United Commercial Bank
San Francisco, CA
Page 25

Case 09-03228   Doc# 10-4   Filed: 02/09/10   Entered: 02/09/10 18:25:14   Page 25
86 of 34

**Notes to Exhibit 2b (restructuring)**

1. The data shown are for illustrative purpose. The figures will vary for actual restructurings.
2. For purposes of loss sharing, losses on restructured loans are calculated as the difference between:
   a. The principal, accrued interest, advances due on the loan, and allowable 3rd party fees prior to restructuring (lines 36-39), and
   b. The Net Present Value (NPV) of the estimated cash flows (line 43). The cash flows should assume no default or prepayment for 10 years, followed by prepayment in full at the end of 10 years (120 months).
3. For owner-occupied residential loans, the NPV is calculated using the most recently published Freddie Mac survey rate on 30-year fixed rate loans as of the restructure date.
4. For investor owned or non-owner occupied residential loans, the NPV is calculated using commercially reasonable rate on 30-year fixed rate loans as of the restructure date.
5. If the new loan is an adjustable-rate loan, interest rate resets and related cash flows should be projected based on the index rate in effect at the date of the loan restructuring. If the restructured loan otherwise provides for specific charges in monthly P&I payments over the term of the loan, those changes should be reflected in the projected cash flows. Assuming Bank must retain supporting schedule of projected cash flows as required by Section 2.1 of the Single Family Shared-Loss Agreement and provide it to the FDIC if requested for a sample audit.
6. Do not include late fees, prepayment penalties, or any similar lender fees or charges by the Failed Bank or Assuming Bank to the loan account, any allocation of Assuming Bank's servicing costs, or any allocations of Assuming Bank's general and administrative (G&A) or other operating costs.
7. The amount of accrued interest that may be added to the balance of the loan is limited to the minimum of:
   a. 90 days
   b. The number of days that the loan is delinquent at the time of restructuring
   c. The number of days between the resolution date and the restructuring
   To calculate accrued interest, apply the note interest rate that would have been in effect if the loan were performing to the principal balance after application of the last payment made by the borrower.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 3.1
November 4, 2009

United Commercial Bank
San Francisco, CA

Case 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:44    Page 26
87 of 34

## Exhibit 2c

This exhibit contains two versions of the loss share calculation for short sales, plus explanatory notes.

### Exhibit 2c(1)
#### CALCULATION OF LOSS FOR SHORT SALE LOANS
#### No Preceeding Loan Mod under Loss Share

| | | |
|---|---|---|
| 1 | Shared-Loss Month: | May-09 |
| 2 | Loan # | 58776 |
| 3 | RO # | 542 |
| | | |
| 4 | Interest paid-to-date | 7/31/08 |
| 5 | Short Payoff Date | 4/17/09 |
| 6 | Note Interest rate | 7.750% |
| 7 | Owner occupied? | Yes |
| | If so: | |
| 8 | Borrower current gross annual income | 38,500 |
| 9 | Estimated NPV of loan mod | 200,000 |
| 10 | Most recent BPO | 380,000 |
| 11 | Most recent BPO date | 1/31/06 |
| | | |
| | **Short-Sale Loss calculation** | |
| 12 | Loan Principal balance | 375,000 |
| | | |
| 13 | Accrued interest, limited to 90 days | 7,266 |
| 14 | Attorney's fees | 0 |
| 15 | Tax and insurance advances | 0 |
| 16 | 3rd party fees due | 2,800 |
| 17 | Incentive to borrower | 2,000 |
| 18 | Gross balance recoverable by Purchaser | 387,066 |
| | | |
| 19 | Amount accepted in Short-Sale | 255,000 |
| 20 | Hazard Insurance | 0 |
| 21 | Mortgage Insurance | 0 |
| | | |
| 22 | Total Cash Recovery | 255,000 |
| | | |
| 23 | **Loss Amount** | 132,066 |

Module I – Whole Bank w/ Loss Share – P&A
Version 3.1
November 4, 2009

Case 09-03228  Doc# 10-4  Filed: 02/09/10  Entered: 02/09/10 18:25:44  Page 27
88 of 34

United Commercial Bank
San Francisco, CA

**Exhibit 2c(2)**
**CALCULATION OF LOSS FOR SHORT SALE LOANS**
**Short Sale after a Covered Loan Mod**

| | | |
|---|---|---:|
| 1 | Shared-Loss Month: | May-09 |
| 2 | Loan # | 20076 |
| 3 | REO # | 345 |
| | | |
| 4 | Loan mod date | 5/12/08 |
| 5 | Interest paid-to-date | 9/30/08 |
| 6 | Short Payoff Date | 4/2/09 |
| 7 | Note Interest rate | 7.500% |
| 8 | Most recent BPO | 230,000 |
| 9 | Most recent BPO date | 1/21/09 |
| | | |
| | **Short-Sale Loss calculation** | |
| 11 | NPV of projected cash flows at loan mod | 311,000 |
| 12 | Less: Principal payments between loan mod and deliquency | 1,000 |
| | Plus: | |
| 13 | Attorney's fees | 0 |
| 14 | Tax and insurance advances | 1,500 |
| 15 | 3rd party fees due | 2,600 |
| 16 | Incentive to borrower | 3,500 |
| 17 | Gross balance recoverable by Purchaser | 317,600 |
| | | |
| 18 | Amount accepted in Short-Sale | 234,000 |
| 19 | Hazard Insurance | 0 |
| 20 | Mortgage Insurance | 0 |
| | | |
| 21 | Total Cash Recovery | 234,000 |
| | | |
| 22 | **Loss Amount** | 83,600 |

Module 1 – Whole Bank w/ Loss Share – P&A
Version 3.1
November 4, 2009

Case 09-03228     Doc# 10-4     Filed: 02/09/10     Entered: 02/09/10 18:25:34     Page 28
of 34
89

United Commercial Bank
San Francisco, CA

**Notes to Exhibit 2c (short sale)**

1. The data shown are for illustrative purpose. The figures will vary for actual short sales.
2. The covered loss is the difference between the gross balance recoverable by Purchaser and the total cash recovery. There are two methods of calculation for covered losses from short sales, depending upon the circumstances. They are shown below:
   a. If the loan was restructured when the Loss Share agreement was in place, and then the short sale occurred, use Exhibit 2c(2). This version uses the Net Present Value (NPV) of the modified loan as the starting point for the covered loss.
   b. Otherwise, use Exhibit 2c(1). This version uses the unpaid balance of the loan as of the last payment as the starting point for the covered loss.
3. For Exhibit 2c(1), the gross balance recoverable by the purchaser is calculated as the sum of lines 12 – 17; it is shown in line 18. For Exhibit 2a(2), the gross balance recoverable by the purchaser is calculated as line 11 minus line 12 plus lines 13 – 16; it is shown in line 17.
4. For Exhibit 2c(1), the total cash recovery is calculated as the sum of lines 19 – 21; it is shown in line 22. For Exhibit 2c(2), the total cash recovery is calculated as the sum of lines 18 – 20; it is shown in line 21.
5. Reasonable and customary third party attorney's fees and expenses incurred by or on behalf of Assuming Bank in connection with any enforcement procedures, or otherwise with respect to such loan, are reported under Attorney's fees.
6. Do not include late fees, prepayment penalties, or any similar lender fees or charges by the Failed Bank or Assuming Bank to the loan account, any allocation of Assuming Bank's servicing costs, or any allocations of Assuming Bank's general and administrative (G&A) or other operating costs.
7. If Exhibit 2c(2) is used, then no accrued interest may be included as a covered loss. Otherwise, the amount of accrued interest that may be included as a covered loss is limited to the minimum of:
   d. 90 days
   e. The number of days that the loan is delinquent when the property was sold
   f. The number of days between the resolution date and the date when the property was sold

To calculate accrued interest, apply the note interest rate that would have been in effect if the loan were performing to the principal balance after application of the last payment made by the borrower.

**Exhibit 2d**

| Shared-Loss Month: | | [input month] | |
|---|---|---|---|
| **Loan no.:** | | [input loan no.) | |
| | | | |
| | | | |
| **NOTE** | | | |
| The calculation of recovery on a loan for which a Restructuring Loss has been paid will only apply if the loan is sold. | | | |
| | | | |
| **EXAMPLE CALCULATION** | | | |
| | | | |
| Restructuring Loss Information | | | |
| Loan principal balance before restructuring | | $ 200,000 | **A** |
| NPV, restructured loan | | 165,000 | **B** |
| Loss on restructured loan | | $ 35,000 | **A – B** |
| Times FDIC applicable loss share % (80% or 95%) | | 80% | |
| **Loss share payment to purchaser** | | $ 28,000 | **C** |
| | | | |
| ***Calculation – Recovery amount due to Receiver*** | | | |
| Loan sales price | | $ 190,000 | |
| NPV of restructured loan at mod date | | 165,000 | |
| Gain - step 1 | | 25,000 | **D** |
| PLUS | | | |
| Loan UPB after restructuring | (1) | 200,000 | |
| Loan UPB at liquidation date | | 192,000 | |
| Gain - step 2 (principal collections after restructuring) | | 8,000 | **E** |
| Recovery amount | | 33,000 | **D + E** |
| Times FDIC loss share % | | 80% | |
| **Recovery due to FDIC** | | $ 26,400 | **F** |
| | | | |
| **Net loss share paid to purchaser (C – F)** | | $ 1,600 | |
| | | | |
| **Proof Calculation** | (2) | | |
| Loan principal balance | | $ 200,000 | **G** |
| | | | |
| Principal collections on loan | | 8,000 | |
| Sales price for loan | | 190,000 | |
| Total collections on loan | | 198,000 | **H** |
| Net loss on loan | | $ 2,000 | **G – H** |
| Times FDIC applicable loss share % (80% or 95%) | | 80% | |
| **Loss share payment to purchaser** | | $ 1,600 | |
| | | | |
| | | | |
| (1) This example assumes that the FDIC loan modification program as shown in Exhibit 5 is applied and the loan restructuring does not result in a reduction in the loan principal balance due from the borrower. | | | |
| (2) This proof calculation is provided to illustrate the concept and the Assuming Bank is not required to provide this with its Recovery calculations. | | | |

Module 1 – Whole Bank w/Loss Share – P&A
Version 1.1
November 4, 2009

United Commercial Bank
San Francisco, CA
Page 30

Case: 09-03228   Doc# 10-4   Filed: 02/09/10   Entered: 02/09/10 18:25:41   Page 30
91 of 34

## Exhibit 3
## Portfolio Performance and Summary Schedule

| SHARED-LOSS LOANS | | | | |
|---|---|---|---|---|
| PORTFOLIO PERFORMANCE AND SUMMARY SCHEDULE | | | | |
| MONTH ENDED: | [input report month] | | | |
| | | | | |
| | | | | |
| **POOL SUMMARY** | | | | |
| | # | $ | | |
| Loans at Sale Date | xx | xx | | |
| | | | | |
| Loans as of this month-end | xx | xx | | |
| | | | | |
| | | | | |
| **STATED THRESHOLD TRACKING** | # | $ | | |
| Stated Threshold amount | ■■■■ | | | A |
| | | | | |
| Cumulative loss payments, prior month | | | | |
| Loss payment for current month | | | | |
| Cumulative loss payment, this month | | | | |
| Cumulative Commercial & Other Loans Net Charge-Offs | | | | |
| | | | | B |
| Remaining to Stated Threshold | ■■■■ | | | A - B |
| | | | | |
| | | | | Percent of Total |
| **PORTFOLIO PERFORMANCE STATUS** | # | $ | | # |
| Current | | | | |
| 30 – 59 days past due | | | | |
| 60 – 89 days past due | | | | |
| 90 – 119 days past due | | | | |
| 120 and over days past due | | | | |
| In foreclosure | | | | |
| ORE | | | | |
| Total | | | | |
| | | | | |
| Memo Item: | | | | |
| Loans in process of restructuring – total | | | | ■■■■ |
| Loans in bankruptcy | | | | |
| | | | | |
| Loans in process of restructuring by delinquency status | | | | |
| Current | | | | |
| 30 - 59 days past due | | | | |
| 60 - 89 days past due | | | | |
| 90 - 119 days past due | | | | |
| 120 and over days past due In foreclosure | | | | |
| Total | | | | |

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

United Commercial Bank
San Francisco, CA

Case 09-03228   Doc# 10-4   Filed: 02/09/10   Entered: 02/09/10 18:25:44   Page 31
92 of 34

| List of Loans Paid Off During Month | | | | |
|---|---|---|---|---|
| Loan # | Principal Balance | | | |
| | | | | |
| **List of Loans Sold During Month** | | | | |
| | | | | |
| Loan # | Principal Balance | | | |
| | | | | |
| | | | | |

Case: 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:34    Page 6 of 32
of 34

## Exhibit 4
## Wire Transfer Instructions

## PURCHASER WIRING INSTRUCTIONS

| **BANK RECEIVING WIRE** | |
|---|---|
| **9 DIGIT ABA ROUTING NUMBER** | |
| **ACCOUNT NUMBER** | |
| **NAME OF ACCOUNT** | |
| **ATTENTION TO WHOM** | |
| **PURPOSE OF WIRE** | |
| **FDIC RECEIVER WIRING INSTRUCTIONS** | |
| **BANK RECEIVING WIRE** | |
| **SHORT NAME** | |
| **ADDRESS OF BANK RECEIVING WIRE** | |
| **9 DIGIT ABA ROUTING NUMBER** | |
| **ACCOUNT NUMBER** | |
| **NAME OF ACCOUNT** | |
| **ATTENTION TO WHOM** | |
| **PURPOSE OF WIRE** | |

Module I – Whole Bank w/ Loss Share – P&A
Version 1.1
November 4, 2009

Case: 09-03228   Doc# 10-4   Filed: 02/09/10   Entered: 02/09/10 18:25:44   Page 33

94 of 34

United Commercial Bank
San Francisco, CA

**EXHIBIT 5**

**FDIC MORTGAGE LOAN MODIFICATION PROGRAM**

Objective

The objective of this FDIC Mortgage Loan Modification Program ("Program") is to modify the terms of certain residential mortgage loans so as to improve affordability, increase the probability of performance, allow borrowers to remain in their homes and increase the value of the loans to the FDIC and assignees. The Program provides for the modification of Qualifying Loans (as defined below) by reducing the borrower's monthly housing debt to income ratio ("DTI Ratio") to no more than 31% at the time of the modification and eliminating adjustable interest rate and negative amortization features.

Qualifying Mortgage Loans

In order for a mortgage loan to be a Qualifying Loan it must meet all of the following criteria, which must be confirmed by the lender:

- The collateral securing the mortgage loan is owner-occupied and the owner's primary residence; and
- The mortgagor has a first priority lien on the collateral; and
- Either the borrower is at least 60 days delinquent or a default is reasonably foreseeable.

Modification Process

The lender shall undertake a review of its mortgage loan portfolio to identify Qualifying Loans. For each Qualifying Loan, the lender shall determine the net present value of the modified loan and, if it will exceed the net present value of the foreclosed collateral upon disposition, then the Qualifying Loan shall be modified so as to reduce the borrower's monthly DTI Ratio to no more than 31% at the time of the modification. To achieve this, the lender shall use a combination of interest rate reduction, term extension and principal forbearance, as necessary.

The borrower's monthly DTI Ratio shall be a percentage calculated by dividing the borrower's monthly income by the borrower's monthly housing payment (including principal, interest, taxes and insurance). For these purposes, (1) the borrower's monthly income shall be the amount of the borrower's (along with any co-borrowers') documented and verified gross monthly income, and (2) the borrower's monthly housing payment shall be the amount required to pay monthly principal and interest plus one-twelfth of the then current annual amount required to pay real property taxes and homeowner's insurance with respect to the collateral.

In order to calculate the monthly principal payment, the lender shall capitalize to the outstanding principal balance of the Qualifying Loan the amount of all delinquent interest, delinquent taxes, past due insurance premiums, third party fees and (without duplication) escrow advances (such amount, the "Capitalized Balance").

Case: 09-03228    Doc# 10-4    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 34 of 34