# EXHIBIT "B-4"

In order to achieve the goal of reducing the DTI Ratio to 31%, the lender shall take the following steps in the following order of priority with respect to each Qualifying Loan:

1. Reduce the interest rate to the then current Freddie Mac Survey Rate for 30-year fixed rate mortgage loans, and adjust the term to 30 years.

2. If the DTI Ratio is still in excess of 31%, reduce the interest rate further, but no lower than 3%, until the DTI ratio of 31% is achieved.

3. If the DTI Ratio is still in excess of 31% after adjusting the interest rate to 3%, extend the remaining term of the loan by 10 years.

4. If the DTI Ratio is still in excess of 31%, calculate a new monthly payment (the "Adjusted Payment Amount") that will result in the borrower's monthly DTI Ratio not exceeding 31%. After calculating the Adjusted Payment Amount, the lender shall bifurcate the Capitalized Balance into two portions – the amortizing portion and the non-amortizing portion. The amortizing portion of the Capitalized Balance shall be the mortgage amount that will fully amortize over a 40-year term at an annual interest rate of 3% and monthly payments equal to the Adjusted Payment Amount. The non-amortizing portion of the Capitalized Balance shall be the difference between the Capitalized Balance and the amortizing portion of the Capitalized Balance. If the amortizing portion of the Capitalized Balance is less than 75% of the current estimated value of the collateral, then the lender may choose not to restructure the loan. If the lender chooses to restructure the loan, then the lender shall forbear on collecting the non-amortizing portion of the Capitalized Balance, and such amount shall be due and payable only upon the earlier of (i) maturity of the modified loan, (ii) a sale of the property or (iii) a pay-off or refinancing of the loan. No interest shall be charged on the non-amortizing portion of the Capitalized Balance, but repayment shall be secured by a first lien on the collateral.

Special Note:

The net present value calculation used to determine whether a loan should be modified based on the modification process above is distinct and different from the net present value calculation used to determine the covered loss if the loan is modified. Please refer only to the net present value calculation described in this exhibit for the modification process, with its separate assumptions, when determining whether to provide a modification to a borrower. Separate assumptions may include, without limitation, Assuming Bank's determination of a probability of default without modification, a probability of default with modification, home price forecasts, prepayment speeds, and event timing. These assumptions are applied to different projected cash flows over the term of the loan, such as the projected cash flow of the loan performing or defaulting without modification and the projected cash flow of the loan performing or defaulting with modification.

By contrast, the net present value for determining the covered loss is based on a 10 year period. While the assumptions in the net present value calculation used in the modification process may change, the net present value calculation for determining the covered loss remains constant.

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 2 of 31

# EXHIBIT 4.15B

## COMMERCIAL AND OTHER ASSETS SHARED-LOSS AGREEMENT

This agreement for reimbursement of loss sharing expenses on certain loans and other assets (the "Commercial Shared-Loss Agreement") shall apply when the Assuming Bank purchases Shared-Loss Assets as that term is defined herein. The terms hereof shall modify and supplement, as necessary, the terms of the Purchase and Assumption Agreement to which this Commercial Shared-Loss Agreement is attached as Exhibit 4.15B and incorporated therein. To the extent any inconsistencies may arise between the terms of the Purchase and Assumption Agreement and this Commercial Shared-Loss Agreement with respect to the subject matter of this Commercial Shared-Loss Agreement, the terms of this Commercial Shared-Loss Agreement shall control. References in this Commercial Shared-Loss Agreement to a particular Section shall be deemed to refer to a Section in this Commercial Shared-Loss Agreement unless the context indicates that a Section of the Purchase and Assumption Agreement is intended.

## ARTICLE I -- DEFINITIONS

Capitalized terms used in this Commercial Shared-Loss Agreement that are not defined in this Commercial Shared-Loss Agreement are defined in the Purchase and Assumption Agreement In addition to the terms defined above, defined below are certain additional terms relating to loss-sharing, as used in this Commercial Shared-Loss Agreement.

"**AAA**" means the American Arbitration Association as provided in Section 2.1(f)(iii) of this Commercial Shared-Loss Agreement.

"**Accrued Interest**" means, with respect to any Shared-Loss Loan, Permitted Advance or Shared-Loss Loan Commitment Advance at any time, the amount of earned and unpaid interest, taxes, credit life and/or disability insurance premiums (if any) payable by the Obligor accrued on or with respect to such Shared-Loss Loan, Permitted Advance or Shared-Loss Loan Commitment Advance, all as reflected on the Accounting Records of the Failed Bank or the Assuming Bank (as applicable); provided, that Accrued Interest shall not include any amount that accrues on or with respect to any Shared-Loss Loan, Permitted Advance or Shared-Loss Loan Commitment Advance after that Asset has been placed on non-accrual or nonperforming status by either the Failed Bank or the Assuming Bank (as applicable).

"**Additional ORE**" means Shared-Loss Loans that become Other Real Estate after Bank Closing Date.

"**Affiliate**" shall have the meaning set forth in the Purchase and Assumption Agreement; provided, that, for purposes of this Commercial Shared-Loss Agreement, no Third Party Servicer shall be deemed to be an Affiliate of the Assuming Bank.

"**Applicable Anniversary of the Commencement Date**" means the fifth (5th) anniversary of the Commencement Date.

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 3 of
31

"**Calendar Quarter**" means a quarterly period (a) for the first such period, beginning on the Commencement Date and ending on the last calendar day of either March, June, September or December, whichever is the first to occur after the Commencement Date, and (b) for quarterly periods thereafter, beginning on the first calendar day of the calendar month immediately after the month that ended the prior period and ending on the last calendar day of each successive three-calendar-month period thereafter (i.e., each March, June, September and December, starting in the applicable order depending on the ending date of first such period) of any year.

"**Capitalized Expenditures**" means those expenditures that (i) would be capitalized under generally accepted accounting principles, and (ii) are incurred with respect to Shared-Loss Loans, Other Real Estate, Additional ORE or Subsidiary ORE. Capitalized Expenditures shall not include expenses related to environmental conditions including, but not limited to, remediation, storage or disposal of any hazardous or toxic substances or any pollutant or contaminant.

"**Charge-Offs**" means, with respect to any Shared-Loss Assets for any period, an amount equal to the aggregate amount of loans or portions of loans classified as "Loss" under the Examination Criteria, including (a) charge-offs of (i) the principal amount of such assets net of unearned interest (including write-downs associated with Other Real Estate, Additional ORE, Subsidiary ORE or loan modification(s)) (ii) Accrued Interest, and (iii) Capitalized Expenditures plus (b) Pre-Charge-Off Expenses incurred on the respective Shared-Loss Loans, all as effected by the Assuming Bank during such period and reflected on the Accounting Records of the Assuming Bank; provided, that: (i) the aggregate amount of Accrued Interest (including any reversals thereof) for the period after Bank Closing that shall be included in determining the amount of Charge-Offs for any Shared-Loss Loan shall not exceed ninety (90) days' Accrued Interest; (ii) no Charge-Off shall be taken with respect to any anticipated expenditure by the Assuming Bank until such expenditure is actually incurred; (iii) any financial statement adjustments made in connection with the purchase of any Assets pursuant to this Purchase and Assumption Agreement or any future purchase, merger, consolidation or other acquisition of the Assuming Bank shall not constitute "Charge-Offs"; and (iv) except for Portfolio Sales or any other sales or dispositions consented to by the Receiver, losses incurred on the sale or other disposition of Shared-Loss Assets to any Person (other than the sale or other disposition of Other Real Estate, Additional ORE or Subsidiary ORE to a Person other than an Affiliate of the Assuming Bank which is conducted in a commercially reasonable and prudent manner) shall not constitute Charge-Offs.

"**Commencement Date**" means the first calendar day following Bank Closing.

"**Consumer Loans**" means Loans to individuals for household, family and other personal expenditures (including United States and/or State-guaranteed student loans and extensions of credit pursuant to a credit card plan or debit card plan).

"**Cumulative Servicing Amount**" means the sum of the Period Servicing Amounts for every consecutive twelve-month period prior to and ending on the True-Up

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 4 of
31

Measurement Date in respect of each of the Shared-Loss Agreements during which the loss-sharing provisions of the applicable Shared-Loss Agreement is in effect.

"**Cumulative Shared-Loss Payments**" means (i) the aggregate of all of the payments made or payable to the Assuming Bank under the Shared-Loss Agreements minus (ii) the aggregate of all of the payments made or payable to the Receiver under the Shared-Loss Agreements.

"**Environmental Assessment**" means an assessment of the presence, storage or release of any hazardous or toxic substance, pollutant or contaminant with respect to the collateral securing a Shared-Loss Loan that has been fully or partially charged off.

"**Examination Criteria**" means the loan classification criteria employed by, or any applicable regulations of, the Assuming Bank's Chartering Authority at the time such action is taken, as such criteria may be amended from time to time.

"**Failed Bank Charge-Offs/Write-Downs**" means, with respect to any Shared-Loss Asset, an amount equal to the aggregate amount of reversals or charge-offs of Accrued Interest and charge-offs and write-downs of principal effected by the Failed Bank with respect to that Shared-Loss Asset as reflected on the Accounting Records of the Failed Bank.

"**Fair Value**" means the value of a Shared Loss MTM Asset as stated on the books and records of the Failed Bank as of Bank Closing, inclusive of all adjustments.

"**FDIC Party**" has the meaning provided in Section 2.1(f)(ii) of this Commercial Shared-Loss Agreement.

"**Net Charge-Offs**" means, with respect to any period, an amount equal to the aggregate amount of Charge-Offs for such period less the amount of Recoveries for such period.

"**Neutral Member**" has the meaning provided in Section 2.1(f)(ii) of this Commercial Shared-Loss Agreement.

"**New Shared-Loss Loans**" means loans that would otherwise be subject to loss sharing under this Commercial Shared-Loss Agreement that were originated after **August 31, 2009** and before Bank Closing.

"**Notice of Dispute**" has the meaning provided in Section 2.1(f)(iii) of this Commercial Shared-Loss Agreement.

"**ORE Subsidiary**" means any Subsidiary of the Assuming Bank that engages solely in holding, servicing, managing or liquidating interests of a type described in clause (A) of the definition of "Other Real Estate," which interests have arisen from the collection or settlement of a Shared-Loss Loan.

"**Other Real Estate**" means all of the following (including any of the following fully or partially charged off the books and records of the Failed Bank or the Assuming Bank)

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 5 of 31

that (i) are owned by the Failed Bank as of Bank Closing and are purchased pursuant to the Purchase and Assumption Agreement or (ii) have arisen subsequent to Bank Closing from the collection or settlement by the Assuming Bank of a Shared-Loss Loan:

    (A)    all interests in real estate (other than Bank Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights; and

    (B)    all other assets (whether real or personal property) acquired by foreclosure or in full or partial satisfaction of judgments or indebtedness.

**"Period Servicing Amount"** means, for any twelve month period with respect to each of the Shared-Loss Agreements during which the loss-sharing provisions of the applicable Shared-Loss Agreement are in effect, the product of (i) the simple average of the principal amount of Shared-Loss Loans and Shared-Loss Assets (other than the Shared-Loss Securities) (in each case as defined in the Shared-Loss Agreements), as the case may be, at the beginning of such period and at the end of such period times (ii) one percent (1%).

**"Permitted Advance"** means an advance of funds by the Assuming Bank with respect to a Shared-Loss Loan, or the making of a legally binding commitment by the Assuming Bank to advance funds with respect to a Shared-Loss Loan, that (i) in the case of such an advance, is actually made, and, in the case of such a commitment, is made and all of the proceeds thereof actually advanced, within one (1) year after the Commencement Date, (ii) does not cause the sum of (A) the book value of such Shared-Loss Loan as reflected on the Accounting Records of the Assuming Bank after any such advance has been made by the Assuming Bank plus (B) the unfunded amount of any such commitment made by the Assuming Bank related thereto, to exceed 110% of the Book Value of such Shared-Loss Loan, (iii) is not made with respect to a Shared-Loss Loan with respect to which (A) there exists a related Shared-Loss Loan Commitment or (B) the Assuming Bank has taken a Charge-Off and (iv) is made in good faith, is supported at the time it is made by documentation in the Credit Files and conforms to and is in accordance with the applicable requirements set forth in Article III of this Commercial Shared-Loss Agreement and with the then effective written internal credit policy guidelines of the Assuming Bank; provided, that the limitations in subparagraphs (i), (ii) and (iii) of this definition shall not apply to any such action (other than to an advance or commitment related to the remediation, storage or final disposal of any hazardous or toxic substance, pollutant or contaminant) that is taken by Assuming Bank in its reasonable discretion to preserve or secure the value of the collateral for such Shared-Loss Loan.

**"Permitted Amendment"** means, with respect to any Shared-Loss Loan Commitment or Shared-Loss Loan, any amendment, modification, renewal or extension thereof, or any waiver of any term, right, or remedy thereunder, made by the Assuming Bank in good faith and otherwise in accordance with the applicable requirements set forth in Article III of this Commercial Shared-Loss Agreement and the then effective written internal credit policy guidelines of the Assuming Bank; provided, that:

    (i) with respect to a Shared-Loss Loan Commitment or a Shared-Loss Loan that is not a

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

100

United Commercial Bank
San Francisco, CA

Case: 09-03228   Doc# 10-5   Filed: 02/09/10   Entered: 02/09/10 18:25:41   Page 6 of 31

revolving line of credit, no such amendment, modification, renewal, extension, or waiver, except as allowed under the definition of Permitted Advance, shall operate to increase the amount of principal (A) then remaining available to be advanced by the Assuming Bank under the Shared-Loss Loan Commitment or (B) then outstanding under the Shared-Loss Loan;

(ii) with respect to a Shared-Loss Loan Commitment or a Shared-Loss Loan that is a revolving line of credit, no such amendment, modification, renewal, extension, or waiver, except as allowed under the definition of Permitted Advance, shall operate to increase the maximum amount of principal authorized as of Bank Closing to be outstanding at any one time under the underlying revolving line of credit relationship with the debtor (regardless of the extent to which such revolving line of credit may have been funded as of Bank Closing or may subsequently have been funded and/or repaid); and

(iii) no such amendment, modification, renewal, extension or waiver shall extend the term of such Shared-Loss Loan Commitment or Shared-Loss Loan beyond the end of the final Shared-Loss Quarter unless the term of such Shared-Loss Loan Commitment or Shared-Loss Loan as existed on Bank Closing was beyond the end of the final Shared-Loss Quarter, in which event no such amendment, modification, renewal, extension or waiver shall extend such term beyond the term as existed as of Bank Closing.

"**Pre-Charge-Off Expenses**" means those expenses incurred in the usual and prudent management of a Shared-Loss Loan that would qualify as a Reimbursable Expense or Recovery Expense if incurred after a Charge-Off of the related Shared-Loss Asset had occurred.

"**Quarterly Certificate**" has the meaning provided in Section 2.1(a)(i) of this Commercial Shared-Loss Agreement.

"**Recoveries**" (I)(A) In addition to any sums to be applied as Recoveries pursuant to subparagraph (II) below, "Recoveries" means, with respect to any period, the sum of (without duplication):

(i) the amount of collections during such period by the Assuming Bank on Charge-Offs of Shared-Loss Assets effected by the Assuming Bank prior to the end of the final Shared-Loss Quarter; plus

(ii) the amount of collections during such period by the Assuming Bank on Failed Bank Charge-Offs/Write-Downs; plus

(iii) the amount of gain on any sale or other disposition during such period by the Assuming Bank of Shared Loss Loans, Other Real Estate, Additional ORE or Subsidiary ORE (provided, that the amount of any such gain included in Recoveries shall not exceed the aggregate amount of the related Failed Bank Charge-Offs/Write-Downs and Charge-Offs taken and any related Reimbursable Expenses and Recovery Expenses); plus

(iv) the amount of collections during such period by the Assuming Bank of any Reimbursable Expenses or Recovery Expenses; plus

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

101

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 7 of
31

(v) the amount of any fee or other consideration received by the Assuming Bank during or prior to such period in connection with any amendment, modification, renewal, extension, refinance, restructure, commitment or other similar action taken by the Assuming Bank with respect to a Shared-Loss Asset with respect to which there exists a Failed Bank Charge-Off/Write-Down or a Shared-Loss Loan as to which a Charge-Off has been effected by the Assuming Bank during or prior to such period (provided, that the amount of any such fee or other consideration included in Recoveries shall not exceed the aggregate amount of the related Failed Bank Charge-Offs/Write-Downs and Charge-Offs taken and any related Reimbursable Expenses and Recovery Expenses).

(I)(B) For the purpose of determining the amounts to be applied as Recoveries pursuant to subparagraph (I)(A) above, the Assuming Bank shall apply amounts received on the Assets that are not otherwise applied to reduce the book value of principal of a Shared-Loss Loan (or, in the case of Other Real Estate, Additional ORE, Subsidiary ORE and Capitalized Expenditures, that are not otherwise applied to reduce the book value thereof) in the following order: first to Charge-Offs and Failed Bank Charge-Offs/Write Downs; then to Reimbursable Expenses and Recovery Expenses; then to interest income; and then to other expenses incurred by the Assuming Bank.

(II) If there occurs an amendment, modification, renewal, extension, refinance, restructure, commitment, sale or other similar action with respect to a Shared-Loss Loan as to which there exists a Failed Bank Charge-Off/Write Down or as to which a Charge-Off has been effected by the Assuming Bank during or prior to such period, and if, as a result of such occurrence, the Assuming Bank recognizes any interest income for financial accounting purposes on that Shared-Loss Loan, then "Recoveries" shall also include the portion of the total amount of any such interest income recognized by the Assuming Bank which is derived by multiplying:

(A) the total amount of any such interest income recognized by the Assuming Bank during such period with respect to that Shared-Loss Loan as described above, by

(B) a fraction, the numerator of which is the aggregate principal amount (excluding reversals or charge-offs of Accrued Interest) of all such Failed Bank Charge-Offs/Write-Downs and Charge-Offs effected by the Assuming Bank with respect to that Shared-Loss Loan plus the principal amount of that Shared-Loss Loan that has not yet been charged-off but has been placed on nonaccrual status, all of which occurred at any time prior to or during the period in which the interest income referred to in subparagraph (II)(A) immediately above was recognized, and the denominator of which is the total amount of principal indebtedness (including all such prior Failed Bank Charge-Offs/Write-Downs and Charge-Offs as described above) due from the Obligor on that Shared-Loss Loan as of the end of such period;

provided, however, that the amount of any interest income included as Recoveries for a particular Shared-Loss Loan shall not exceed the aggregate amount of (a) Failed Bank Charge-Offs/Write-Downs, (b) Charge-Offs effected by the Assuming Bank during or prior to the period in which the amount of Recoveries is being determined, plus (c) any Reimbursable Expenses and

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

102

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 8 of
31

Recovery Expenses paid to the Assuming Bank pursuant to this Commercial Shared-Loss Agreement during or prior to the period in which the amount of Recoveries is being determined, all with respect to that particular Shared-Loss Loan; and, provided, further, that any collections on any such Shared-Loss Loan that are not applied to reduce book value of principal or recognized as interest income shall be applied pursuant to subparagraph (I) above.

(III) Notwithstanding subparagraphs (I) and (II) above, the term "Recoveries" shall not include: (a) any amounts paid to the Assuming Bank by the Receiver pursuant to Section 2.1 of this Commercial Shared-Loss Agreement, (b) amounts received with respect to Charge-Offs effected by the Assuming Bank after the final Shared-Loss Quarter, (c) after the final Shared-Loss Quarter, income received by the Assuming Bank from the operation of, and any gains recognized by the Assuming Bank on the disposition of, Other Real Estate, Additional ORE or Subsidiary ORE (such income and gains being hereinafter together referred to as "ORE Income"), except to the extent that aggregate ORE Income exceeds the aggregate expenses paid to third parties by or on behalf of the Assuming Bank after the final Shared-Loss Quarter to manage, operate and maintain Other Real Estate, Additional ORE or Subsidiary ORE (such expenses being hereinafter referred to as "ORE Expenses"). In determining the extent aggregate ORE Income exceeds aggregate ORE Expenses for any Recovery Quarter as set forth immediately above in subparagraph (c), the Assuming Bank will subtract (i) ORE Expenses paid to third parties during such Recovery Quarter (provided, that, in the case of the final Recovery Quarter only, the Assuming Bank will subtract ORE Expenses paid to third parties from the beginning of the final Recovery Quarter up to the date the Assuming Bank is required to deliver the final Quarterly Certificate pursuant to this Commercial Shared-Loss Agreement) from (ii) ORE Income received during such Recovery Quarter, to calculate net ORE income ("Net ORE Income") for that Recovery Quarter. If the amount of Net ORE Income so calculated for a Recovery Quarter is positive, such amount shall be reported as Recoveries on the Quarterly Certificate for such Recovery Quarter. If the amount of Net ORE Income so calculated for a Recovery Quarter is negative ("Net ORE Loss Carryforward"), such amount shall be added to any ORE Expenses paid to third parties in the next succeeding Recovery Quarter, which sum shall then be subtracted from ORE Income for that next succeeding Recovery Quarter, for the purpose of determining the amount of Net ORE Income (or, if applicable, Net ORE Loss Carryforward) for that next succeeding Recovery Quarter. If, as of the end of the final Recovery Quarter, a Net ORE Loss Carryforward exists, then the amount of the Net ORE Loss Carryforward that does not exceed the aggregate amount of Net ORE Income reported as Recoveries on Quarterly Certificates for all Recovery Quarters may be included as a Recovery Expense on the Quarterly Certificate for the final Recovery Quarter.

"**Recovery Amount**" has the meaning provided in Section 2.1(b)(ii) of this Commercial Shared-Loss Agreement.

"**Recovery Expenses**" means, for any Recovery Quarter, the amount of actual, reasonable and necessary out-of-pocket expenses (other than Capitalized Expenditures) paid to third parties (other than Affiliates of the Assuming Bank) by or on behalf of the Assuming Bank, as limited by Sections 3.2(c) and (d) of Article III to this Commercial Shared-Loss Agreement, to recover amounts owed with respect to (i) any Shared-Loss Asset as to which a Charge-Off was effected prior to the end of the final Shared-Loss Quarter (provided that such amounts were

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

103

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 9 of
31

incurred no earlier than the date the first Charge-Off on such Shared-Loss Asset could have been reflected on the Accounting Records of the Assuming Bank), and (ii) Failed Bank Charge-Offs/Write-Downs (including, in each case, all costs and expenses related to an Environmental Assessment and any other costs or expenses related to any environmental conditions with respect to the Shared-Loss Assets (it being understood that any remediation expenses for any such pollutant or contaminant are not recoverable if in excess of $200,000 per Shared-Loss Asset, without the Assuming Bank having obtained the prior consent of the Receiver for such expenses); provided, that, so long as income with respect to a Shared-Loss Loan is being prorated pursuant to the arithmetical formula in subsection (II) of the definition of "Recoveries", the term "Recovery Expenses" shall not include that portion of any such expenses paid during such Recovery Quarter to recover any amounts owed on that Shared-Loss Loan that is derived by:

> subtracting (1) the product derived by multiplying:

>> (A) the total amount of any such expenses paid by or on behalf of the Assuming Bank during such Recovery Quarter with respect to that Shared-Loss Loan, by

>> (B) a fraction, the numerator of which is the aggregate principal amount (excluding reversals or charge-offs of Accrued Interest) of all such Failed Bank Charge-Offs/Write-Downs and Charge-Offs effected by the Assuming Bank with respect to that Shared-Loss Loan plus the principal amount of that Shared-Loss Loan that has not yet been charged-off but has been placed on nonaccrual status, all of which occurred at any time prior to or during the period in which the interest income referred to in subparagraph (II)(A) of the definition of "Recoveries" was recognized, and the denominator of which is the total amount of principal indebtedness (including all such prior Failed Bank Charge-Offs/Write-Downs and Charge-Offs as described above) due from the Obligor on that Shared-Loss Loan as of the end of such period;

> from (2) the total amount of any such expenses paid during that Recovery Quarter with respect to that Shared-Loss Loan.

**"Recovery Quarter"** has the meaning provided in Section 2.1(a)(ii) of this Commercial Shared-Loss Agreement.

**"Reimbursable Expenses"** means, for any Shared-Loss Quarter, the amount of actual, reasonable and necessary out-of-pocket expenses (other than Capitalized Expenditures), paid to third parties (other than Affiliates of the Assuming Bank) by or on behalf of the Assuming Bank, as limited by Sections 3.2(c) and (d) of Article III of this Commercial Shared-Loss Agreement, to:

> (i) recover amounts owed with respect to any Shared-Loss Asset as to which a Charge-Off has been effected prior to the end of the final Shared-Loss Quarter (provided that such amounts were incurred no earlier than the date the first Charge-Off on such Shared-Loss Asset could have been reflected on the Accounting Records of the Assuming Bank) and recover

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

104

United Commercial Bank
San Francisco, CA

Case: 09-03228   Doc# 10-5   Filed: 02/09/10   Entered: 02/09/10 18:25:41   Page 10 of 31

amounts owed with respect to Failed Bank Charge-Offs/Write-Downs (including, in each case, all costs and expenses related to an Environmental Assessment and any other costs or expenses related to any environmental conditions with respect to the Shared-Loss Assets (it being understood that any such remediation expenses for any such pollutant or contaminant are not recoverable if in excess of $200,000 per Shared-Loss Asset, without the Assuming Bank having obtained the prior consent of the Receiver for such expenses); provided, that, so long as income with respect to a Shared-Loss Asset is being pro-rated pursuant to the arithmetical formula in subsection (II) of the definition of "Recoveries", the term "Reimbursable Expenses" shall not include that portion of any such expenses paid during such Shared-Loss Quarter to recover any amounts owed on that Shared-Loss Loan that is derived by:

subtracting (1) the product derived by multiplying:

(A) the total amount of any such expenses paid by or on behalf of the Assuming Bank during such Shared-Loss Quarter with respect to that Shared-Loss Loan, by

(B) a fraction, the numerator of which is the aggregate principal amount (excluding reversals or charge-offs of Accrued Interest) of all such Failed Bank Charge-Offs/Write-Downs and Charge-Offs effected by the Assuming Bank with respect to that Shared-Loss Loan plus the principal amount of that Shared-Loss Loan that has not yet been charged-off but has been placed on nonaccrual status, all of which occurred at any time prior to or during the period in which the interest income referred to in subparagraph (II)(A) of the definition of "Recoveries" was recognized, and the denominator of which is the total amount of principal indebtedness (including all such prior Failed Bank Charge-Offs/Write-Downs and Charge-Offs as described above) due from the Obligor on that Shared-Loss Loan as of the end of such period;

from (2) the total amount of any such expenses paid during that Shared-Loss Quarter with respect to that Shared-Loss Loan; and

(ii) manage, operate or maintain Other Real Estate, Additional ORE or Subsidiary ORE less the amount of any income received by the Assuming Bank during such Shared-Loss Quarter with respect to such Other Real Estate, Additional ORE or Subsidiary ORE (which resulting amount under this clause (ii) may be negative).

"**Review Board**" has the meaning provided in Section 2.1(f)(i) of this Commercial Shared-Loss Agreement.

"**Shared-Loss Amount**" has the meaning provided in Section 2.1(b)(i) of this Commercial Shared-Loss Agreement.

"**Shared-Loss Asset Repurchase Price**" means, with respect to any Shared-Loss Asset, the principal amount thereof plus any other fees or penalties due from an Obligor (including, subject to the limitations discussed below, the amount of any Accrued Interest) stated on the Accounting Records of the Assuming Bank, as of the date as of which the Shared-Loss

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

105

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 11
of 31

Asset Repurchase Price is being determined (regardless, in the case of a Shared-Loss Loan, of the Legal Balance thereof) plus all Reimbursable Expenses and Recovery Expenses incurred up to and through the date of consummation of purchase of such Shared-Loss Asset; _provided, that_ (i) in the case of a Shared-Loss Loan there shall be excluded from such amount the amount of any Accrued Interest accrued on or with respect to such Shared-Loss Loan prior to the ninety (90)-day period ending on the day prior to the purchase date determined pursuant to Sections 2.1(e)(i) or 2.1(e)(iii) of this Commercial Shared-Loss Agreement, except to the extent such Accrued Interest was included in the Book Value of such Shared-Loss Loan, and (ii) any collections on a Shared-Loss Loan received by the Assuming Bank after the purchase date applicable to such Shared-Loss Loan shall be applied (without duplication) to reduce the Shared-Loss Asset Repurchase Price of such Shared-Loss Loan on a dollar-for-dollar basis. For purposes of determining the amount of unpaid interest which accrued during a given period with respect to a variable-rate Shared-Loss Loan, all collections of interest shall be deemed to be applied to unpaid interest in the chronological order in which such interest accrued.

  **"Shared-Loss Assets"** means Shared-Loss Loans, Other Real Estate purchased by the Assuming Bank, Additional ORE, Subsidiary ORE and Capitalized Expenditures, but does not include Shared Loss MTM Assets.

  **"Shared-Loss Loan Commitment"** means:

   (i) any Commitment to make a further extension of credit or to make a further advance with respect to an existing Shared-Loss Loan; and

   (ii) any Shared-Loss Loan Commitment (described in subparagraph (i) immediately preceding) with respect to which the Assuming Bank has made a Permitted Amendment.

  **"Shared-Loss Loan Commitment Advance"** means an advance pursuant to a Shared-Loss Loan Commitment with respect to which the Assuming Bank has <u>not</u> made a Permitted Advance.

  **"Shared-Loss Loans"** means:

   (i)(A) Loans purchased by the Assuming Bank pursuant to the Purchase and Assumption Agreement set forth on Exhibit 4.15(b) to the Purchase and Assumption Agreement, (B) New Shared-Loss Loans purchased by the Assuming Bank pursuant to the Purchase and Assumption Agreement, (C) Permitted Advances and (D) Shared-Loss Loan Commitment Advances, if any; _provided, that_ Shared-Loss Loans shall not include Loans, New Shared-Loss Loans, Permitted Advances and Shared-Loss Loan Commitment Advances with respect to which an Acquired Subsidiary, or a constituent Subsidiary thereof, is an Obligor; (E) Loans owned by any Subsidiary which are not Shared-Loss Loans under the Single Family Shared-Loss Agreement; and (F) Consumer Loans; and

   (ii) any Shared-Loss Loans (described in subparagraph (i) immediately preceding) with respect to which the Assuming Bank has made a Permitted Amendment.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

106

United Commercial Bank
San Francisco, CA

Case: 09-03228 Doc# 10-5 Filed: 02/09/10 Entered: 02/09/10 18:25:41 Page 12 of 31

"**Shared-Loss MTM Assets**" means those securities and other assets listed on Exhibit 4.15(C).

"**Shared-Loss Payment Trigger**" means when the sum of the Cumulative Loss Amount under the Single Family Shared-Loss Agreement and the cumulative Net Charge-Offs under this Commercial Shared-Loss Agreement, exceeds the First Loss Tranche. If the First Loss Tranche is zero or a negative number, the Shared-Loss Payment Trigger shall be deemed to have been reached upon Bank Closing.

"**Shared-Loss Quarter**" has the meaning provided in Section 2.1(a)(i) of this Commercial Shared-Loss Agreement.

"**Stated Threshold**" means total losses under the shared loss agreements in the amount of $2,050,000,000.00.

"**Subsidiary ORE**" means all assets owned by ORE Subsidiaries that would constitute Additional ORE if such assets were on the books of the Assuming Bank.

"**Termination Date**" means the eighth (8th) anniversary of the Commencement Date.

"**Third Party Servicer**" means any servicer appointed from time to time by the Assuming Bank or any Affiliate of the Assuming Bank to service the Shared-Loss Assets on behalf of the Assuming bank, the identity of which shall be given to the Receiver prior to or concurrent with the appointment thereof.

## ARTICLE II -- SHARED-LOSS ARRANGEMENT

### 2.1     Shared-Loss Arrangement.

(a)     **Quarterly Certificates.** (i) Not later than thirty (30) days after the end of each Calendar Quarter from and including the initial Calendar Quarter to and including the Calendar Quarter in which the Applicable Anniversary of the Commencement Date falls (each of such Calendar Quarters being referred to herein as a "Shared-Loss Quarter"), the Assuming Bank shall deliver to the Receiver a certificate, signed by the Assuming Bank's chief executive officer and its chief financial officer, setting forth in such form and detail as the Receiver may specify (a "Quarterly Certificate"):

(A)     the amount of Charge-Offs, the amount of Recoveries and the amount of Net Charge-Offs (which amount may be negative) during such Shared-Loss Quarter with respect to the Shared-Loss Assets (and for Recoveries, with respect to the Assets for which a charge-off was effected by the Failed Bank prior to Bank Closing); and

(B)     the aggregate amount of Reimbursable Expenses (which amount

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

107

United Commercial Bank
San Francisco, CA

Case: 09-03228     Doc# 10-5     Filed: 02/09/10     Entered: 02/09/10 18:25:41     Page 13 of 31

may be negative) during such Shared-Loss Quarter; and

      (C)    net realized loss on the Shared Loss MTM Assets determined pursuant to FAS 115, expressed as a positive number (MTM Net Realized Loss), or net realized gain on the Shared Loss MTM assets, expressed as a negative number (MTM Net Realized Gain); and

      (D)    any other than temporary impairment of the Shared Loss MTM Assets, determined pursuant to FAS 115, expressed as a positive number ("OTTI Loss") or reversals of OTTI Loss, expressed as a negative number (for the avoidance of doubt, normal and customary unrealized mark-to-market changes by reason of the application of fair value accounting do not qualify for loss sharing payments).

      (ii)    Not later than thirty (30) days after the end of each Calendar Quarter from and including the first Calendar Quarter following the final Shared-Loss Quarter to and including the Calendar Quarter in which the Termination Date falls (each of such Calendar Quarters being referred to herein as a "Recovery Quarter"), the Assuming Bank shall deliver to the Receiver a Quarterly Certificate setting forth, in such form and detail as the Receiver may specify

      (A)    the amount of Recoveries and Recovery Expenses during such Recovery Quarter. On the Quarterly Certificate for the first Recovery Quarter only, the Assuming Bank may report as a separate item, in such form and detail as the Receiver may specify, the aggregate amount of any Reimbursable Expenses that: (a) were incurred prior to or during the final Shared-Loss Quarter, and (b) had not been included in any Quarterly Certificate for any Shared-Loss Quarter because they had not been actually paid by or on behalf of the Assuming Bank (in accordance with the terms of this Commercial Shared-Loss Agreement) during any Shared-Loss Quarter and (c) were actually paid by or on behalf of the Assuming Bank (in accordance with the terms of this Commercial Shared-Loss Agreement) during the first Recovery Quarter; and

      (B)    net realized gain on the Shared Loss MTM Assets.

**(b)**    **Payments With Respect to Shared-Loss Assets.**

      (i)    For purposes of this Section 2.1(b), the Assuming Bank shall initially record the Shared-Loss Assets on its Accounting Records at Book Value, and initially record the Shared Loss MTM Assets on its Accounting Records at Fair Value, and adjust such amounts as such values may change after the Bank Closing. If the amount of all Net Charge-Offs during any Shared-Loss Quarter plus Reimbursable Expenses, plus MTM Net Realized Gain or MTM Net Realized Loss, plus OTTI Loss during such Shared-Loss Quarter (the "Shared-Loss Amount") is positive, then, except as provided in Sections 2.1(c) and (e) below, and subject to the provisions of Section 2.1(b)(vi) below, not later than fifteen (15) days after the date on which the Receiver receives the Quarterly Certificate with respect to such Shared-Loss Quarter, the Receiver shall

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

108

United Commercial Bank
San Francisco, CA

Case: 09-03228   Doc# 10-5   Filed: 02/09/10   Entered: 02/09/10 18:25:41   Page 14 of 31

pay to the Assuming Bank an amount equal to eighty percent (80%) of the Shared-Loss Amount for such Shared-Loss Quarter. If the Shared-Loss Amount during any Shared-Loss Quarter is negative, the Assuming Bank shall pay to the Receiver an amount equal to eighty percent (80%) of the Shared-Loss Amount for such Shared-Loss Quarter, which payment shall be delivered to the Receiver together with the Quarterly Certificate for such Shared-Loss Quarter. When the cumulative Shared-Loss Amounts for all Shared-Loss Quarters plus the Cumulative Loss Amount under the Single Family Shared-Loss Agreement equals or exceeds the Stated Threshold, the Receiver shall pay to the Assuming Bank an amount equal to ninety-five percent ((95%) of the Shared-Loss Amount for each Shared-Loss Quarter, until such time as the cumulative Shared-Loss Amount for all Shared-Loss Quarters is less than the Stated Threshold, when the percentage shall revert back to eighty percent (80%).

(ii)     If the amount of gross Recoveries during any Recovery Quarter less Recovery Expenses during such Recovery Quarter plus net realized gains or reversals of OTTI Loss on Shared Loss MTM Assets (the "Recovery Amount") is positive, then, simultaneously with its delivery of the Quarterly Certificate with respect to such Recovery Quarter, the Assuming Bank shall pay to the Receiver an amount equal to eighty percent (80%) of the Recovery Amount for such Recovery Quarter. If the Recovery Amount is negative, then such negative amount shall be subtracted from the amount of gross Recoveries during the next succeeding Recovery Quarter in determining the Recovery Amount in such next succeeding Recovery Quarter; provided, that this Section 2.1(b)(ii) shall operate successively in the event that the Recovery Amount (after giving effect to this Section 2.1(b)(ii)) in such next succeeding Recovery Quarter is negative. The Assuming Bank shall specify, in the Quarterly Certificate for the final Recovery Quarter, the aggregate amount for all Recovery Quarters only, as of the end of, and including, the final Recovery Quarter of (A) Recoveries plus net realized gains or reversals of OTTI Loss on Shared Loss MTM Assets ("Aggregate Recovery Period Recoveries"), (B) Recovery Expenses ("Aggregate Recovery Expenses"), and (C) only those Recovery Expenses that have been actually "offset" against Aggregate Recovery Period Recoveries (including those so "offset" in that final Recovery Quarter) ("Aggregate Offset Recovery Expenses"); as used in this sentence, the term "offset" means the amount that has been applied to reduce gross Recoveries in any Recovery Quarter pursuant to the methodology set forth in this Section 2.1(b)(ii).  If, at the end of the final Recovery Quarter the amount of Aggregate Recovery Expenses exceeds the amount of Aggregate Recovery Period Recoveries, the Receiver shall have no obligation to pay to the Assuming Bank all or any portion of such excess. Subsequent to the Assuming Bank's calculation of the Recovery Amount (if any) for the final Recovery Quarter, the Assuming Bank shall also show on the Quarterly Certificate for the final Recovery Quarter the results of the following three mathematical calculations: (i) Aggregate Recovery Period Recoveries minus Aggregate Offset Recovery Expenses; (ii) Aggregate Recovery Expenses minus Aggregate Offset Recovery Expenses; and (iii) the lesser of the two amounts calculated in (i) and (ii) immediately above ("Additional Recovery Expenses") multiplied by 80% (the amount so calculated in (iii) being defined as the "Additional Recovery Expense Amount"). If the Additional Recovery Expense Amount is greater than zero, then the Assuming Bank may request in the Quarterly Certificate for the final Recovery Quarter that the Receiver reimburse the Assuming Bank the amount of the Additional Recovery Expense Amount and the Receiver shall pay to the Assuming Bank the Additional Recovery Expense Amount within fifteen (15) days after the date on which the Receiver receives that Quarterly

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

109

United Commercial Bank
San Francisco, CA

Case: 09-03228   Doc# 10-5   Filed: 02/09/10   Entered: 02/09/10 18:25:41   Page 15 of 31

Certificate. On the Quarterly Certificate for the final Recovery Quarter only, the Assuming Bank may include, in addition to any Recovery Expenses for that Recovery Quarter that were paid by or on behalf of the Assuming Bank in that Recovery Quarter, those Recovery Expenses that: (a) were incurred prior to or during the final Recovery Quarter, <u>and</u> (b) had <u>not</u> been included in any Quarterly Certificate for any Recovery Quarter because they had not been actually paid by or on behalf of the Assuming Bank (in accordance with the terms of this Commercial Shared-Loss Agreement) during any Recovery Quarter, <u>and</u> (c) were actually paid by or on behalf of the Assuming Bank (in accordance with the terms of this Commercial Shared-Loss Agreement) prior to the date the Assuming Bank is required to deliver that final Quarterly Certificate to the Receiver under the terms of Section 2.1(a)(ii).

(iii)    With respect to each Shared-Loss Quarter and Recovery Quarter, collections by or on behalf of the Assuming Bank on any charge-off effected by the Failed Bank prior to Bank Closing on an Asset other than a Shared-Loss Asset or Shared-Loss MTM Assets shall be reported as Recoveries under this Section 2.1 only to the extent such collections exceed the Book Value of such Asset, if any. For any Shared-Loss Quarter or Recovery Quarter in which collections by or on behalf of the Assuming Bank on such Asset are applied to both Book Value and to a charge-off effected by the Failed Bank prior to Bank Closing, the amount of expenditures incurred by or on behalf of the Assuming Bank attributable to the collection of any such Asset, that shall be considered a Reimbursable Expense or a Recovery Expense under this Section 2.1 will be limited to a proportion of such expenditures which is equal to the proportion derived by dividing (A) the amount of collections on such Asset applied to a charge-off effected by the Failed Bank prior to Bank Closing, by (B) the total collections on such Assets.

(iv)    If the Assuming Bank has duly specified an amount of Reimbursable Expenses on the Quarterly Certificate for the first Recovery Quarter as described above in the last sentence of Section 2.1(a)(ii), then, not later than fifteen (15) days after the date on which the Receiver receives that Quarterly Certificate, the Receiver shall pay to the Assuming Bank an amount equal to eighty percent (80%) (or, if the Cumulative Loss Amount under the Single Family Shared-Loss Agreement plus the cumulative Shared-Loss Amount for all Shared-Loss Quarters equals or exceeds the Stated Threshold, ninety-five percent (95%)) of the amount of such Reimbursable Expenses.

(v)    If the First Loss Tranche as determined under the Purchase and Assumption Agreement is a positive number, Receiver has no obligation to make payment for any Shared Loss Quarters until the Shared-Loss Payment Trigger is satisfied.

(vi)    Payments from the Receiver with respect to this Commercial Shared-Loss Agreement are administrative expenses of the Receiver. To the extent the Receiver needs funds for shared-loss payments respect to this Commercial Shared-Loss Agreement, the Receiver shall request funds under the Master Loan and Security Agreement, as amended ("MLSA"), from FDIC in its corporate capacity. The Receiver will not agree to any amendment of the MLSA that would prevent the Receiver from drawing on the MLSA to fund shared-loss payments.

**(c)    Limitation on Shared-Loss Payment.** The Receiver shall not be required to make any payments pursuant to this Section 2.1 with respect to any Charge-Off of a Shared-

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

110

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 16
of 31

Loss Asset that the Receiver or the Corporation determines, based upon the Examination Criteria, should not have been effected by the Assuming Bank; provided, (x) the Receiver must provide notice to the Assuming Bank detailing the grounds for not making such payment, (y) the Receiver must provide the Assuming Bank with a reasonable opportunity to cure any such deficiency and (z) (1) to the extent curable, if cured, the Receiver shall make payment with respect to any properly effected Charge-Off and (2) to the extent not curable, the Receiver shall make a payment as to all Charge-Offs (or portion of Charge-Offs) that were effected which would have been payable as a Charge-Off if the Assuming Bank had properly effected such Charge-Off. In the event that the Receiver does not make any payments with respect to any Charge-Off of a Shared-Loss Asset pursuant to this Section 2.1 or determines that a payment was improperly made, the Assuming Bank and the Receiver shall, upon final resolution, make such accounting adjustments and payments as may be necessary to give retroactive effect to such corrections.

**(d)** **Sale of, or Additional Advances or Amendments with Respect to, Shared-Loss Loans and Administration of Related Loans.** No Shared-Loss Loan shall be treated as a Shared-Loss Asset pursuant to this Section 2.1 (i) if the Assuming Bank sells or otherwise transfers such Shared-Loss Loan or any interest therein (whether with or without recourse) to any Person, (ii) after the Assuming Bank makes any additional advance, commitment or increase in the amount of a commitment with respect to such Shared-Loss Loan that does not constitute a Permitted Advance or a Shared-Loss Loan Commitment Advance, (iii) after the Assuming Bank makes any amendment, modification, renewal or extension to such Shared-Loss Loan that does not constitute a Permitted Amendment, or (iv) after the Assuming Bank has managed, administered or collected any "Related Loan" (as such term is defined in Section 3.4 of Article III of this Commercial Shared-Loss Agreement) in any manner which would have the effect of increasing the amount of any collections with respect to the Related Loan to the detriment of such Shared-Loss Asset to which such loan is related; provided, that any such Shared-Loss Loan that has been the subject of Charge-Offs prior to the taking of any action described in clause (i), (ii), (iii) or (iv) of this Section 2.1(d) by the Assuming Bank shall be treated as a Shared-Loss Asset pursuant to this Section 2.1 solely for the purpose of treatment of Recoveries on such Charge-Offs until such time as the amount of Recoveries with respect to such Shared-Loss Asset equals such Charge-Offs.

**(e)** **Option to Purchase.**

(i)     In the event that the Assuming Bank determines that there is a substantial likelihood that continued efforts to collect a Shared-Loss Asset or an Asset for which a charge-off was effected by the Failed Bank with, in either case, a Legal Balance of $500,000 or more on the Accounting Records of the Assuming Bank will result in an expenditure, after Bank Closing, of funds by on behalf of the Assuming Bank to a third party for a specified purpose (the expenditure of which, in its best judgment, will maximize collections), which do not constitute Reimbursable Expenses or Recovery Expenses, and such expenses will exceed ten percent (10%) of the then book value thereof as reflected on the Accounting Records of the Assuming Bank, the Assuming Bank shall (i) promptly so notify the Receiver and (ii) request that such expenditure be treated as a Reimbursable Expense or Recovery Expense for purposes of this Section 2.1. (Where the Assuming Bank determines that there is a substantial likelihood that the previously

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

111

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 17
of 31

mentioned situation exists with respect to continued efforts to collect a Shared-Loss Asset or an Asset for which a charge-off was effected by the Failed Bank with, in either case, a Legal Balance of less than $1,000,000 on the Accounting Records of the Assuming Bank, the Assuming Bank may so notify the Receiver and request that such expenditure be treated as a Reimbursable Expense or Recovery Expense.) Within thirty (30) days after its receipt of such a notice, the Receiver will advise the Assuming Bank of its consent or denial, that such expenditures shall be treated as a Reimbursable Expense or Recovery Expense, as the case may be. Notwithstanding the failure of the Receiver to give its consent with respect to such expenditures, the Assuming Bank shall continue to administer such Shared-Loss Asset in accordance with Section 2.2, except that the Assuming Bank shall not be required to make such expenditures. At any time after its receipt of such a notice and on or prior to the Termination Date the Receiver shall have the right to purchase such Shared-Loss Asset or Asset as provided in Section 2.1(e)(iii), notwithstanding any consent by the Receiver with respect to such expenditure.

        (ii)     During the period prior to the Termination Date, the Assuming Bank shall notify the Receiver within fifteen (15) days after any of the following becomes fully or partially charged-off:

        (A) a Shared-Loss Loan having a Legal Balance (or, in the case of more than one (1) Shared-Loss Loan made to the same Obligor, a combined Legal Balance) of $500,000 or more in circumstances in which the legal claim against the relevant Obligor survives; or

        (B) a Shared-Loss Loan to a director, an "executive officer" as defined in 12 C.F.R. 215.2(d), a "principal shareholder" as defined in 12 C.F.R. 215.2(l), or an Affiliate of the Assuming Bank.

        (iii)    If the Receiver determines in its discretion that the Assuming Bank is not diligently pursuing collection efforts with respect to any Shared-Loss Asset which has been fully or partially charged-off or written-down (including any Shared-Loss Asset which is identified or required to be identified in a notice pursuant to Section 2.1(e)(ii)) or any Asset for which there exists a Failed Bank Charge-Off/Write-Down, the Receiver may at its option, exercisable at any time on or prior to the Termination Date, require the Assuming Bank to assign, transfer and convey such Shared-Loss Asset or Asset to and for the sole benefit of the Receiver for a price equal to the Shared-Loss Asset Repurchase Price thereof less the Related Liability Amount with respect to any Related Liabilities related to such Shared-Loss Asset or Asset.

        (iv)    Not later than ten (10) days after the date upon which the Assuming Bank receives notice of the Receiver's intention to purchase or require the assignment of any Shared-Loss Asset or Asset pursuant to Section 2.1(e)(i) or (iii), the Assuming Bank shall transfer to the Receiver such Shared-Loss Asset or Asset and any Credit Files relating thereto and shall take all such other actions as may be necessary and appropriate to adequately effect the transfer of such Shared-Loss Asset or Asset from the Assuming Bank to the Receiver. Not later than fifteen (15) days after the date upon which the Receiver receives such Shared-Loss Asset or Asset and any Credit Files relating thereto, the Receiver shall pay to the Assuming Bank an amount equal to the

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

112

United Commercial Bank
San Francisco, CA

Case: 09-03228   Doc# 10-5   Filed: 02/09/10   Entered: 02/09/10 18:25:41   Page 18 of 31

Shared-Loss Asset Repurchase Price of such Shared-Loss Asset or Asset less the Related Liability Amount.

      (v)     The Receiver shall assume all Related Liabilities with respect to any Shared-Loss Asset or Asset set forth in the notice described in Section 2.1(e)(iv).

      **(f)**     **Dispute Resolution.**

      (i) (A) Any dispute as to whether a Charge-Off of a Shared-Loss Asset was made in accordance with Examination Criteria shall be resolved by the Assuming Bank's Chartering Authority. (B) With respect to any other dispute arising under the terms of this Commercial Shared-Loss Agreement which the parties hereto cannot resolve after having negotiated such matter, in good faith, for a thirty (30) day period, other than a dispute the Corporation is not permitted to submit to arbitration under the Administrative Dispute Resolution Act of 1996 ("ADRA"), as amended, such other dispute shall be resolved by determination of a review board (a "Review Board") established pursuant to Section 2.1(f). Any Review Board under this Section 2.1(f) shall follow the provisions of the Federal Arbitration Act and shall follow the provisions of the ADRA. (C) Any determination by the Assuming Bank's Chartering Authority or by a Review Board shall be conclusive and binding on the parties hereto and not subject to further dispute, and judgment may be entered on said determination in accordance with applicable arbitration law in any court having jurisdiction thereof.

      (ii)     A Review Board shall consist of three (3) members, each of whom shall have such expertise as the Corporation and the Assuming Bank agree is relevant. As appropriate, the Receiver or the Corporation (the "FDIC Party") will select one member, one member will be selected by the Assuming Bank and the third member (the "Neutral Member") will be selected by the other two members. The member of the Review Board selected by a party may be removed at any time by such party upon two (2) days' written notice to the other party of the selection of a replacement member. The Neutral Member may be removed by unanimous action of the members appointed by the FDIC Party and the Assuming Bank after two (2) days' prior written notice to the FDIC Party and the Assuming Bank of the selection of a replacement Neutral Member. In addition, if a Neutral Member fails for any reason to serve or continue to serve on the Review Board, the other remaining members shall so notify the parties to the dispute and the Neutral Member in writing that such Neutral Member will be replaced, and the Neutral Member shall thereafter be replaced by the unanimous action of the other remaining members within twenty (20) business days of that notification.

      (iii)     No dispute may be submitted to a Review Board by any of the parties to this Commercial Shared-Loss Agreement unless such party has provided to the other party a written notice of dispute ("Notice of Dispute"). During the forty-five (45)-day period following the providing of a Notice of Dispute, the parties to the dispute will make every effort in good faith to resolve the dispute by mutual agreement. As part of these good faith efforts, the parties should consider the use of less formal dispute resolution techniques, as judged appropriate by each party in its sole discretion. Such techniques may include, but are not limited to, mediation, settlement conference, and early neutral evaluation. If the parties have not agreed to a resolution of the dispute by the end of such forty-five (45)-day period, then, subject to the discretion of the

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

113

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 19
of 31

Corporation and the written consent of the Assuming Bank as set forth in Section 2.1(f)(i)(B) above, on the first day following the end of such period, the FDIC Party and the Assuming Bank shall notify each other of its selection of its member of the Review Board and such members shall be instructed to promptly select the Neutral Member of the Review Board. If the members appointed by the FDIC Party and the Assuming Bank are unable to promptly agree upon the initial selection of the Neutral Member, or a timely replacement Neutral Member as set forth in Section 2.1(f)(ii) above, the two appointed members shall apply to the American Arbitration Association ("AAA"), and such Neutral Member shall be appointed in accordance with the Commercial Arbitration Rules of the AAA.

(iv)     The resolution of a dispute pursuant to this Section 2.1(f) shall be governed by the Commercial Arbitration Rules of the AAA to the extent that such rules are not inconsistent with this Section 2.1(f). The Review Board may modify the procedures set forth in such rules from time to time with the prior approval of the FDIC Party and the Assuming Bank.

(v)     Within fifteen (15) days after the last to occur of the final written submissions of both parties, the presentation of witnesses, if any, and oral presentations, if any, the Review Board shall adopt the position of one of the parties and shall present to the parties a written award regarding the dispute. The determination of any two (2) members of a Review Board will constitute the determination of such Review Board.

(vi)     The FDIC Party and the Assuming Bank will each pay the fees and expenses of the member of the Review Board selected by it. The FDIC Party and Assuming Bank will share equally the fees and expenses of the Neutral Member. No such fees or expenses incurred by or on behalf of the Assuming Bank shall be subject to reimbursement by the FDIC Party under this Commercial Shared-Loss Agreement or otherwise.

(vii)     Each party will bear all costs and expenses incurred by it in connection with the submission of any dispute to a Review Board. No such costs or expenses incurred by or on behalf of the Assuming Bank shall be subject to reimbursement by the FDIC Party under this Commercial Shared-Loss Agreement or otherwise. The Review Board shall have no authority to award costs or expenses incurred by either party to these proceedings.

(viii)     Any dispute resolution proceeding held pursuant to this Section 2.1(f) shall not be public. In addition, each party and each member of any Review Board shall strictly maintain the confidentiality of all issues, disputes, arguments, positions and interpretations of any such proceeding, as well as all information, attachments, enclosures, exhibits, summaries, compilations, studies, analyses, notes, documents, statements, schedules and other similar items associated therewith, except as the parties agree in writing or such disclosure is required pursuant to law, rule or regulation. Pursuant to ADRA, dispute resolution communications may not be disclosed either by the parties or by any member of the Review board unless:

(1) all parties to the dispute resolution proceeding agree in writing;
(2) the communication has already been made public;
(3) the communication is required by statute, rule or regulation to be made public;

or

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

114

United Commercial Bank
San Francisco, CA

Case: 09-03228     Doc# 10-5     Filed: 02/09/10     Entered: 02/09/10 18:25:41     Page 20
of 31

(4) a court determines that such testimony or disclosure is necessary to prevent a manifest injustice, help establish a violation of the law or prevent harm to the public health or safety, or of sufficient magnitude in the particular case to outweigh the integrity of dispute resolution proceedings in general by reducing the confidence of parties in future cases that their communications will remain confidential.

(ix)     Any dispute resolution proceeding pursuant to this Section 2.1(f) (whether as a matter of good faith negotiations, by resort to a Review Board, or otherwise) is a compromise negotiation for purposes of the Federal Rules of Evidence and state rules of evidence. The parties agree that all proceedings, including any statement made or document prepared by any party, attorney or other participants are privileged and shall not be disclosed in any subsequent proceeding or document or construed for any purpose as an admission against interest. Any document submitted and any statements made during any dispute resolution proceeding are for settlement purposes only. The parties further agree not to subpoena any of the members of the Review Board or any documents submitted to the Review Board. In no event will the Neutral Member voluntarily testify on behalf of any party.

(x)     No decision, interpretation, determination, analysis, statement, award or other pronouncement of any Review Board shall constitute precedent as regards any subsequent proceeding (whether or not such proceeding involves dispute resolution under this Commercial Shared-Loss Agreement) nor shall any Review Board be bound to follow any decision, interpretation, determination, analysis, statement, award or other pronouncement rendered by any previous Review Board or any other previous dispute resolution panel which may have convened in connection with a transaction involving other failed financial institutions or Federal assistance transactions.

(xi)     The parties may extend any period of time in this Section 2.1(f) by mutual agreement. Notwithstanding anything above to the contrary, no dispute shall be submitted to a Review Board until each member of the Review Board, and any substitute member, if applicable, agrees to be bound by the provisions of this Section 2.1(f) as applicable to members of a Review Board. Prior to the commencement of the Review Board proceedings, or, in the case of a substitute Neutral Member, prior to the re-commencement of such proceedings subsequent to that substitution, the Neutral Member shall provide a written oath of impartiality.

(xii)     For the avoidance of doubt, and notwithstanding anything herein to the contrary, in the event any notice of dispute is provided to a party under this Section 2.1(g) prior to the Termination Date, the terms of this Commercial Shared-Loss Agreement shall remain in effect with respect to any such items set forth in such notice until such time as any such dispute with respect to such item is finally resolved.

(g)     **Payment in the Event Losses Fail to Reach Expected Level**. On the date that is 45 days following the last day (such day, the "True-Up Measurement Date") of the calendar month in which the tenth anniversary of the calendar day following the Bank Closing occurs, the Assuming Bank shall pay to the Receiver fifty percent (50%) of the excess, if any, of (i) twenty percent (20%) of the Stated Threshold less (ii) the sum of (A) twenty-five percent

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

115

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 21 of 31

(25%) of the asset premium (discount) plus (B) twenty-five percent (25%) of the Cumulative Shared-Loss Payments plus (C) the Cumulative Servicing Amount. The Assuming Bank shall deliver to the Receiver not later than 30 days following the True-Up Measurement Date, a schedule, signed by an officer of the Assuming Bank, setting forth in reasonable detail the calculation of the Cumulative Shared-Loss Payments and the Cumulative Servicing Amount.

**2.2** **Administration of Shared-Loss Assets.** The Assuming Bank shall at all times prior to the Termination Date comply with the Rules Regarding the Administration of Shared-Loss Assets as set forth in Article III of this Commercial Shared-Loss Agreement.

**2.3** **Auditor Report; Right to Audit.**

(a) Within ninety (90) days after the end of each fiscal year from and including the fiscal year during which Bank Closing falls to and including the calendar year during which the Termination Date falls, the Assuming Bank shall deliver to the Corporation and to the Receiver a report signed by its independent public accountants stating that they have reviewed the terms of this Commercial Shared-Loss Agreement and that, in the course of their annual audit of the Assuming Bank's books and records, nothing has come to their attention suggesting that any computations required to be made by the Assuming Bank during such year by this Article II were not made by the Assuming Bank in accordance herewith. In the event that the Assuming Bank cannot comply with the preceding sentence, it shall promptly submit to the Receiver corrected computations together with a report signed by its independent public accountants stating that, after giving effect to such corrected computations, nothing has come to their attention suggesting that any computations required to be made by the Assuming Bank during such year by this Article II were not made by the Assuming Bank in accordance herewith. In such event, the Assuming Bank and the Receiver shall make all such accounting adjustments and payments as may be necessary to give effect to each correction reflected in such corrected computations, retroactive to the date on which the corresponding incorrect computation was made. It is the intention of this provision to align the timing of the audit required under this Commercial Shared-Loss Agreement with the examination audit required pursuant to 12 C.F.R. Section 363.

(b) The Assuming Bank shall perform on an annual basis an internal audit of its compliance with the provisions of this Article II and shall provide the Receiver and the Corporation with copies of the internal audit reports and access to internal audit workpapers related to such internal audit.

(c) The Receiver or the Corporation may perform an audit to determine the Assuming Bank's compliance with the provisions of this Commercial Shared-Loss Agreement, including this Article II, at any time by providing not less than ten (10) Business Days prior written notice. The scope and duration of any such audit shall be within the discretion of the Receiver or the Corporation, as the case may be, but shall in no event be administered in a manner that unreasonably interferes with the operation of the Assuming Bank's business. The Receiver or the Corporation, as the case may be, shall bear the expense of any such audit. In the event that any corrections are necessary as a result of such an audit, the Assuming Bank and the Receiver shall make such accounting adjustments and payments as may be necessary to give retroactive effect to such corrections.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

116

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 22
of 31

**2.4 Withholdings.** Notwithstanding any other provision in this Article II, the Receiver, upon the direction of the Director (or designee) of the Corporation's Division of Resolutions and Receiverships, may withhold payment for any amounts included in a Quarterly Certificate delivered pursuant to Section 2.1, if, in its judgment, there is a reasonable basis under the terms of this Commercial Shared-Loss Agreement for denying the eligibility of an item for which reimbursement or payment is sought under such Section. In such event, the Receiver shall provide a written notice to the Assuming Bank detailing the grounds for withholding such payment. At such time as the Assuming Bank demonstrates to the satisfaction of the Receiver that the grounds for such withholding of payment, or portion of payment, no longer exist or have been cured, then the Receiver shall pay the Assuming Bank the amount withheld which the Receiver determines is eligible for payment, within fifteen (15) Business Days. In the event the Receiver or the Assuming Bank elects to submit the issue of the eligibility of the item for reimbursement or payment for determination under the dispute resolution procedures of Section 2.1(f), then (i) if the dispute is settled by the mutual agreement of the parties in accordance with Section 2.1(f)(iii), the Receiver shall pay the amount withheld (to the extent so agreed) within fifteen (15) Business Days from the date upon which the dispute is determined by the parties to be resolved by mutual agreement, and (ii) if the dispute is resolved by the determination of a Review Board, the Receiver shall pay the amount withheld (to the extent so determined) within fifteen (15) Business Days from the date upon which the Receiver is notified of the determination by the Review Board of its obligation to make such payment. Any payment by the Receiver pursuant to this Section 2.4 shall be made together with interest on the amount thereof from the date the payment was agreed or determined otherwise to be due, at the interest rate per annum determined by the Receiver to be equal to the coupon equivalent of the three (3)-month U.S. Treasury Bill Rate in effect as of the first Business Day of each Calendar Quarter during which such interest accrues as reported in the Federal Reserve Board's Statistical Release for Selected Interest Rates H.15 opposite the caption "Auction Average - 3-Month" or, if not so reported for such day, for the next preceding Business Day for which such rate was so reported.

**2.5 Books and Records.** The Assuming Bank shall at all times during the term of this Commercial Shared-Loss Agreement keep books and records which fairly present all dealings and transactions carried out in connection with its business and affairs. Except as otherwise provided for in the Purchase and Assumption Agreement or this Commercial Shared-Loss Agreement, all financial books and records shall be kept in accordance with generally accepted accounting principles, consistently applied for the periods involved and in a manner such that information necessary to determine compliance with any requirement of the Purchase and Assumption Agreement or this Commercial Shared-Loss Agreement will be readily obtainable, and in a manner such that the purposes of the Purchase and Assumption Agreement or this Commercial Shared-Loss Agreement may be effectively accomplished. Without the prior written approval of the Corporation, the Assuming Bank shall not make any change in its accounting principles adversely affecting the value of the Shared-Loss Assets except as required by a change in generally accepted accounting principles. The Assuming Bank shall notify the Corporation of any change in its accounting principles affecting the Shared-Loss Assets which it believes are required by a change in generally accepted accounting principles.

**2.6 Information**. The Assuming Bank shall promptly provide to the Corporation

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

117

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 23
of 31

such other information, including financial statements and computations, relating to the performance of the provisions of the Purchase and Assumption Agreement or otherwise relating to its business and affairs or this Commercial Shared-Loss Agreement, as the Corporation or the Receiver may request from time to time.

**2.7    Tax Ruling.** The Assuming Bank shall not at any time, without the Corporation's prior written consent, seek a private letter ruling or other determination from the Internal Revenue Service or otherwise seek to qualify for any special tax treatment or benefits associated with any payments made by the Corporation pursuant to the Purchase and Assumption Agreement or this Commercial Shared-Loss Agreement.

## ARTICLE III - RULES REGARDING THE ADMINISTRATION OF SHARED-LOSS ASSETS AND SHARED-LOSS MTM ASSETS

**3.1    Agreement with Respect to Administration.** The Assuming Bank shall (and shall cause any of its Affiliates to which the Assuming Bank transfers any Shared-Loss Assets or Shared-Loss MTM Assets) to, or a Third Party Servicer to, manage, administer, and collect the Shared-Loss Assets and Shared-Loss MTM Assets while owned by the Assuming Bank or any Affiliate thereof during the term of this Commercial Shared-Loss Agreement in accordance with the rules set forth in this Article III ("Rules"). The Assuming Bank shall be responsible to the Receiver and the Corporation in the performance of its duties hereunder and shall provide to the Receiver and the Corporation such reports as the Receiver or the Corporation reasonably deems advisable, including but not limited to the reports required by Section 3.3 hereof, and shall permit the Receiver and the Corporation at all times to monitor the Assuming Bank's performance of its duties hereunder.

**3.2    Duties of the Assuming Bank with Respect to Shared-Loss Assets.**

(a)    In performance of its duties under these Rules, the Assuming Bank shall:

(i) manage, administer, collect and effect Charge-Offs and Recoveries with respect to each Shared-Loss Asset in a manner consistent with (A) usual and prudent business and banking practices; (B) the Assuming Bank's (or, in the case a Third Party Servicer is engaged, the Third Party Servicer's) practices and procedures including, without limitation, the then-effective written internal credit policy guidelines of the Assuming Bank, with respect to the management, administration and collection of and taking of charge-offs and write-downs with respect to loans, other real estate and repossessed collateral that do not constitute Shared Loss Assets;

(ii) exercise its best business judgment in managing, administering, collecting and effecting Charge-Offs with respect to Shared-Loss Assets;

(iii) use its best efforts to maximize collections with respect to Shared-Loss Assets and, if applicable for a particular Shared-Loss Asset, without regard to the effect of maximizing collections on assets held by the Assuming Bank or any of its Affiliates that are not

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

118

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 24 of 31

Shared-Loss Assets;

(iv) adopt and implement accounting, reporting, record-keeping and similar systems with respect to the Shared-Loss Assets, as provided in Section 3.4 hereof;

(v) retain sufficient staff to perform its duties hereunder; and

(vi) provide written notification in accordance with Article IV of this Commercial Shared-Loss Agreement immediately after the execution of any contract pursuant to which any third party (other than an Affiliate of the Assuming Bank) will manage, administer or collect any of the Shared-Loss Assets, together with a copy of that contract.

(b) Any transaction with or between any Affiliate of the Assuming Bank with respect to any Shared-Loss Asset including, without limitation, the execution of any contract pursuant to which any Affiliate of the Assuming Bank will manage, administer or collect any of the Shared-Loss Assets, or any other action involving self-dealing, shall be subject to the prior written approval of the Receiver or the Corporation.

(c) The following categories of expenses shall not be deemed to be Reimbursable Expenses or Recovery Expenses:

(i) Federal, State, or local income taxes and expenses related thereto;

(ii) salaries or other compensation and related benefits of Assuming Bank employees and the employees of its Affiliates including, without limitation, any bonus, commission or severance arrangements, training, payroll taxes, dues, or travel- or relocation-related expenses,;

(iii) the cost of space occupied by the Assuming Bank, any Affiliate thereof and their staff, the rental of and maintenance of furniture and equipment, and expenses for data processing including the purchase or enhancement of data processing systems;

(iv) except as otherwise provided herein, fees for accounting and other independent professional consultants (other than consultants retained to assess the presence, storage or release of any hazardous or toxic substance, or any pollutant or contaminant with respect to the collateral securing a Shared-Loss Loan that has been fully or partially charged-off); provided, that for purposes of this Section 3.2(c)(iv), fees of attorneys and appraisers engaged as necessary to assist in collections with respect to Shared-Loss Assets shall not be deemed to be fees of other independent consultants;

(v) allocated portions of any other overhead or general and administrative expense other than any fees relating to specific assets, such as appraisal fees or environmental audit fees, for services of a type the Assuming Bank does not normally perform internally;

(vi) any expense not incurred in good faith and with the same degree of care that the Assuming Bank normally would exercise in the collection of troubled assets in

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

119

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 25
of 31

which it alone had an interest; and

      (vii) any expense incurred for a product, service or activity that is of an extravagant nature or design.

      (d)  Subject to Section 3.7, the Assuming Bank shall not contract with third parties to provide services the cost of which would be a Reimbursable Expense or Recovery Expense if the Assuming Bank would have provided such services itself if the relevant Shared-Loss Assets were not subject to the loss-sharing provisions of Section 2.1 of this Commercial Shared-Loss Agreement.

### 3.3  Duties of the Assuming Bank with Respect to Shared-Loss MTM Assets.

      (a)  In performance of its duties under these Rules, the Assuming Bank shall:

      (i) manage, administer, collect and each Shared-Loss MTM Asset in a manner consistent with (A) usual and prudent business and banking practices; (B) the Assuming Bank's practices and procedures including, without limitation, the then-effective written internal credit policy guidelines of the Assuming Bank, with respect to the management, administration and collection of similar assets that are not Shared-Loss MTM Assets;

      (ii) exercise its best business judgment in managing, administering, collecting and effecting Charge-Offs with respect to Shared-Loss MTM Assets;

      (iii) use its best efforts to maximize collections with respect to Shared-Loss MTM Assets and, if applicable for a particular Shared-Loss MTM Asset, without regard to the effect of maximizing collections on assets held by the Assuming Bank or any of its Affiliates that are not Shared-Loss MTM Assets, provided that, any sale of a Shared-Loss MTM Asset shall only be made with the prior approval of the Receiver or the Corporation;

      (iv) adopt and implement accounting, reporting, record-keeping and similar systems with respect to the Shared-Loss MTM Assets, as provided in Section 3.4 hereof;

      (v) retain sufficient staff to perform its duties hereunder; and

      (vi) provide written notification in accordance with Article IV of this Commercial Shared-Loss Agreement immediately after the execution of any contract pursuant to which any third party (other than an Affiliate of the Assuming Bank) will manage, administer or collect any of the Shared-Loss MTM Assets, together with a copy of that contract.

      (b)  Any transaction with or between any Affiliate of the Assuming Bank with respect to any Shared-Loss MTM Asset including, without limitation, the execution of any contract pursuant to which any Affiliate of the Assuming Bank will manage, administer or collect any of the Shared-Loss Assets, or any other action involving self-dealing, shall be subject to the prior written approval of the Receiver or the Corporation.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

120

United Commercial Bank
San Francisco, CA

Case: 09-03228   Doc# 10-5   Filed: 02/09/10   Entered: 02/09/10 18:25:41   Page 26
of 31

(c) The Assuming Bank shall not contract with third parties to provide services the cost of which would be a Reimbursable Expense or Recovery Expense if the Assuming Bank would have provided such services itself if the relevant Shared-Loss Assets were not subject to the loss-sharing provisions of Section 2.1 of this Commercial Shared-Loss Agreement.

**3.4** **Records and Reports**. The Assuming Bank shall establish and maintain records on a separate general ledger, and on such subsidiary ledgers as may be appropriate to account for the Shared-Loss Assets and the Shared-Loss MTM Assets, in such form and detail as the Receiver or the Corporation may require, to enable the Assuming Bank to prepare and deliver to the Receiver or the Corporation such reports as the Receiver or the Corporation may from time to time request regarding the Shared-Loss Assets, the Shared-Loss MTM Assets and the Quarterly Certificates required by Section 2.1 of this Commercial Shared-Loss Agreement.

**3.5** **Related Loans**.

(a) The Assuming Bank shall not manage, administer or collect any "Related Loan" in any manner which would have the effect of increasing the amount of any collections with respect to the Related Loan to the detriment of the Shared-Loss Asset to which such loan is related. A "Related Loan" means any loan or extension of credit held by the Assuming Bank at any time on or prior to the end of the final Recovery Quarter that is: (i) made to the same Obligor with respect to a Loan that is a Shared-Loss Asset or with respect to a Loan from which Other Real Estate, Additional ORE or Subsidiary ORE derived, or (ii) attributable to the same primary Obligor with respect to any Loan described in clause (i) under the rules of the Assuming Bank's Chartering Authority concerning the legal lending limits of financial institutions organized under its jurisdiction as in effect on the Commencement Date, as applied to the Assuming Bank.

(b) The Assuming Bank shall prepare and deliver to the Receiver with the Quarterly Certificates for the Calendar Quarters ending June 30 and December 31 for all Shared-Loss Quarters and Recovery Quarters, a schedule of all Related Loans which are commercial loans or commercial real estate loans with Legal Balances of $500,000 or more on the Accounting Records of the Assuming Bank as of the end of each such semi-annual period, and all other commercial loans or commercial real estate loans attributable to the same Obligor on such loans of $500,000 or more.

**3.6** **Legal Action; Utilization of Special Receivership Powers**. The Assuming Bank shall notify the Receiver in writing (such notice to be given in accordance with Article IV below and to include all relevant details) prior to utilizing in any legal action any special legal power or right which the Assuming Bank derives as a result of having acquired a Shared-Loss Asset from the Receiver, and the Assuming Bank shall not utilize any such power unless the Receiver shall have consented in writing to the proposed usage. The Receiver shall have the right to direct such proposed usage by the Assuming Bank and the Assuming Bank shall comply in all respects with such direction. Upon request of the Receiver, the Assuming Bank will advise the Receiver as to the status of any such legal action. The Assuming Bank shall immediately notify the Receiver of any judgment in litigation involving any of the aforesaid special powers or rights.

**3.7** **Third Party Servicer**. The Assuming Bank may perform any of its obligations

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

121

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 27
of 31

and/or exercise any of its rights under this Commercial Shared-Loss Agreement through or by one or more Third Party Servicers, who may take actions and make expenditures as if any such Third Party Servicer was the Assuming Bank hereunder (and, for the avoidance of doubt, such expenses incurred by any such Third Party Servicer on behalf of the Assuming Bank shall be Reimbursable Expenses or Recovery Expenses, as the case may be, to the same extent such expenses would so qualify if incurred by the Assuming Bank); provided, however, that the use thereof by the Assuming Bank shall not release the Assuming Bank of any obligation or liability hereunder.

## ARTICLE IV -- PORTFOLIO SALE

**4.1** **Assuming Bank Portfolio Sales of Remaining Shared-Loss Assets**. The Assuming Bank shall have the right with the concurrence of the Receiver, commencing as of the first day of the third to last Shared-Loss Quarter, to liquidate for cash consideration, in one or more transactions, all or a portion of Shared-Loss Assets held by the Assuming Bank ("Portfolio Sales"). If the Assuming Bank exercises its option under this Section 4.1, it must give thirty (30) days notice in writing to the Receiver setting forth the details and schedule for the Portfolio Sale which shall be conducted by means of sealed bid sales to third parties, not including any of the Assuming Bank's affiliates, contractors, or any affiliates of the Assuming Bank's contractors.

**4.2** **Calculation of Sale Gain or Loss**. For Shared-Loss Assets gain or loss on the sales under Section 4.1 will be calculated as the sale price received by the Assuming Bank less the book value of the remaining Shared-Loss Assets.

## ARTICLE V -- LOSS-SHARING NOTICES GIVEN TO CORPORATION AND/OR RECEIVER

As a supplement to the notice provisions contained in Section 13.7 of the Purchase and Assumption Agreement, any notice, request, demand, consent, approval, or other communication (a "Notice") given to the Corporation and/or the Receiver in the loss-sharing context shall be given as follows:

**5.1** With respect to a Notice under Section 2 and Sections 3.1-3.5 of this Commercial Shared-Loss Agreement:

> Federal Deposit Insurance Corporation
> Division of Resolutions and Receiverships
> 550 17th Street, N.W.
> Washington, D.C. 20429
>
> Attention: Assistant Director, Franchise and Asset Marketing

**5.2** With respect to a Notice under Section 3.6 of this Commercial Shared-Loss Agreement:

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

122

United Commercial Bank
San Francisco, CA

Case: 09-03228   Doc# 10-5   Filed: 02/09/10   Entered: 02/09/10 18:25:41   Page 28 of 31

Federal Deposit Insurance Corporation Legal Division
40 Pacifica
Irvine, CA 92618
Attention: Managing Attorney

with a copy to:

Federal Deposit Insurance Corporation Legal Division
550 17th Street, N.W.
Washington, D.C. 20429
Attention: Senior Counsel (Special Issues Group)

## ARTICLE VI – MISCELLANEOUS

**6.1** **Expenses**.  Except as otherwise expressly provided herein, all costs and expenses incurred by a party hereto in connection with this Commercial Shared-Loss Agreement shall be borne by such party whether or not the transactions contemplated herein shall be consummated.

**6.2** **Successors and Assigns; Specific Performance.**  All terms and provisions of this Commercial Shared-Loss Agreement shall be binding upon and shall inure to the benefit of the parties hereto only; provided, however, that, Receiver may assign or otherwise transfer this Commercial Shared-Loss Agreement (in whole or in part) to the Federal Deposit Insurance Corporation in its corporate capacity without the consent of Assuming Bank.  Notwithstanding anything to the contrary contained in this Commercial Shared-Loss Agreement, except as is expressly permitted in this Section 6.2, Assuming Bank may not assign or otherwise transfer this Commercial Shared-Loss Agreement (in whole or in part) without the prior written consent of the Receiver, which consent may be granted or withheld by the Receiver in its sole discretion, and any attempted assignment or transfer in violation of this provision shall be void *ab initio*. For the avoidance of doubt, a merger or consolidation of the Assuming Bank with and into another financial institution, the sale of all or substantially all of the assets of the Assuming Bank to another financial institution constitutes the transfer of this Commercial Shared-Loss Agreement which requires the consent of the Receive; and for a period of  thirty-six (36) months after Bank Closing, a merger or consolidation shall also include the sale by any individual shareholder, or shareholders acting in concert, of more than 9% of the outstanding shares of the Assuming Bank, or of its holding company (except for a holding company with shares that are publicly traded and listed on a stock exchange)., or of any subsidiary holding Shared-Loss Assets, or the sale of shares by the Assuming Bank or its holding company (except for a holding company with shares that are publicly traded and listed on a stock exchange). or any subsidiary holding Shared-Loss Assets, in a public or private offering, that increases the number of shares outstanding by more than 9% and after issuance results in a change of shareholder interest of more than 9%, constitutes the transfer of this Commercial Shared-Loss Agreement which requires the consent of the Receiver.  However, no Loss shall be recognized as a result of any accounting adjustments that are made due to any such merger, consolidation or sale consented to by the FDIC.  The FDIC's consent shall not be required if the aggregate outstanding principal balance of Shared-Loss Assets is less than twenty percent (20%)  of the initial aggregate balance of Shared-Loss Assets.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

123

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 29 of 31

**6.3** **Governing Law**. This Commercial Shared-Loss Agreement shall be construed in accordance with federal law, or, if there is no applicable federal law, the laws of the State of New York, without regard to any rule of conflict of law that would result in the application of the substantive law of any jurisdiction other than the State of New York.

**6.4** **WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF OR RELATING TO OR IN CONNECTION WITH THIS COMMERCIAL SHARED-LOSS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

**6.5** **Captions**. All captions and headings contained in this Commercial Shared-Loss Agreement are for convenience of reference only and do not form a part of, and shall not affect the meaning or interpretation of, this Commercial Shared-Loss Agreement.

**6.6** **Entire Agreement; Amendments**. This Commercial Shared-Loss Agreement, along with the Single Family Shared-Loss Agreement and the Purchase and Assumption Agreement, including the Exhibits and any other documents delivered pursuant hereto, embody the entire agreement of the parties with respect to the subject matter hereof, and supersede all prior representations, warranties, offers, acceptances, agreements and understandings, written or oral, relating to the subject matter herein. This Commercial Shared-Loss Agreement may be amended or modified or any provision thereof waived only by a written instrument signed by both parties or their respective duly authorized agents.

**6.7** **Severability**. Whenever possible, each provision of this Commercial Shared-Loss Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Commercial Shared-Loss Agreement is held to be prohibited by or invalid, illegal or unenforceable under applicable law, such provision shall be construed and enforced as if it had been more narrowly drawn so as not to be prohibited, invalid, illegal or unenforceable, and the validity, legality and enforceability of the remainder of such provision and the remaining provisions of this Commercial Shared-Loss Agreement shall not in any way be affected or impaired thereby.

**6.8** **No Third Party Beneficiary.** This Commercial Shared-Loss Agreement and the Exhibits hereto are for the sole and exclusive benefit of the parties hereto and their respective permitted successors and permitted assigns and there shall be no other third party beneficiaries, and nothing in Commercial Shared-Loss Agreement or the Exhibits shall be construed to grant to any other Person any right, remedy or claim under or in respect of this Commercial Shared-Loss Agreement or any provision hereof.

**6.9** **Consent**. Except as otherwise provided herein, when the consent of a party is required herein, such consent shall not be unreasonably withheld or delayed.

**6.10** **Rights Cumulative**. Except as otherwise expressly provided herein, the rights of each of the parties under this Commercial Shared-Loss Agreement are cumulative, may be

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

124

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 30 of 31

exercised as often as any party considers appropriate and are in addition to each such party's rights under the Purchase and Sale Agreement and any of the related agreements or under law. Except as otherwise expressly provided herein, any failure to exercise or any delay in exercising any of such rights, or any partial or defective exercise of such rights, shall not operate as a waiver or variation of that or any other such right.

Module 1 – Whole Bank w/ Loss Share – P&A
Version 1.11
November 4, 2009

125

United Commercial Bank
San Francisco, CA

Case: 09-03228    Doc# 10-5    Filed: 02/09/10    Entered: 02/09/10 18:25:41    Page 31 of 31